FLOYD *v.* STATE.

(Division B. May 8, 1933.)

[148 So. 226. No. 30489.]

M. Ney Williams, of Raymond, Howie & Howie, and R. T. Hilton, all of Jackson, for appellant.

**W. H. Hughes,** and **R. T. Hilton,** of Jackson, for appellant.

22

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **J. H. Howie** and **W. H. Hughes**, for appellant, and **W. D. Conn, Jr.**, for the state.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant was tried and convicted, in the circuit court of Hinds county, Mississippi, on a charge of assault and battery, with intent to kill and murder his wife, and was sentenced to serve a term of five years in the state penitentiary, from which judgment he appeals here.

It is assigned as error that: First, the evidence is wholly insufficient to support the verdict; second, that the testimony of Mrs. Floyd, the party assaulted, was not corroborated by any other witnesses, nor by any of the physical facts and circumstances in the case; that Mrs. Floyd was shown to have had an unbalanced mind for years before her injury, and also at the time of her injury, to the extent that her testimony was unworthy of belief and could not be relied upon, and that her testimony at the trial was so contradictory as to be insufficient to sustain the verdict; third, that the trial court erred in refusing the appellant the right to cross-examine Dr. Sigrest as to whether or not, in his opinion, the wounds inflicted upon Mrs. Floyd could have been self-inflicted; fourth, that it was error for the court to allow the district attorney to ask such questions of the appellant's daughters as were clearly irrelevant and calculated to inflame the mind of the jury against the appellant; fifth, it was error for the district attorney to be allowed to ask Mrs. Scott, witness for the appellant, irrelevant and incompetent questions calculated to inflame the minds of the jury against the appellant; and, sixth, it was error for the court to have given certain

instructions, and to ask Mrs. Floyd as to whether or not the appellant had, on previous occasions, assaulted and whipped her and her son.

The record is voluminous and the briefs in the case elaborate. We have carefully read the record and briefs, and have reached the conclusion that there was error in introducing evidence of other assaults disconnected with the assault for which the appellant was being tried, and conduct disconnected with the assault on the part of C. N. Floyd toward members of his family, and especially his wife; and also that it was error to refuse to allow Dr. Sigrest to give his opinion, as a physician, as to whether or not the blows could have been self-inflicted.

We will not undertake to set out all the pertinent testimony, but will only state such as is necessary to get an understanding of the questions presented, which will be but briefly set forth.

Mrs. Floyd, wife of the appellant, and prosecuting witness in the case, was assaulted on the night of April 20, 1932, by some one, the wounds having been inflicted upon her head by an ax which was found near the body, and she testified that her husband struck her with the ax, not being certain as to the time, but placing it, in her judgment, as between seven and seven-thirty P. M. Her testimony is not entirely consistent, and is contradictory in certain material respects. She made statements shortly after the injury that she did not know who inflicted the wounds, but expressed the belief, or opinion, that her husband did so. She also testified that they lived in the town of Flora, in Madison county, but that her husband maintained an office in Jackson, Mississippi, and was in the habit of going to his office in Jackson daily, except Saturday and Sunday, when he would be in his local office at Flora, Mississippi, and that in the evenings he was sometimes at his Flora office. She testified that he ate breakfast at home in the morning,

and returned in the afternoon usually around five P. M. and ate a second meal at home, not usually taking a midday meal in Jackson; that on the day in question he returned home bringing some pork chops which he requested her to cook, and she started to cook them for him, and that he abused and cursed her telling her he was not going to live with her, applying an insulting epithet to her, and that she suggested, when she had finished cooking the pork chops, that he wait until the children returned, they then being engaged in milking the cows at the barn, and he declined to do so, and ate up all the pork chops; that the children then came in and were dissatisfied with the meal, began fussing, and one girl threw a sugar bowl at her brother; that, while the children were eating, she washed up the dishes, and, thinking of some kindling in the yard, went into the yard, took the ax to chop some kindling, they using a wood stove, and that she did not know where C. N. Floyd went after he finished his meal. That when she went into the yard to get kindling, and while she had the ax in her hand, her husband, the appellant, came in front of her and she recognized him, the moon was shining, and that he seized her hand over the ax handle, struck her over the head with the ax, and she then became unconscious.

It appears from the testimony on behalf of appellant, C. N. Floyd, that after supper he went down town, and between seven and eight P. M. was seen on the streets in front of certain stores in conversation with different people. From the testimony of the telephone operator in Flora it appears that Floyd called her over the telephone for the purpose of inquiring if he had any calls, and that they were carrying on a conversation when some one entered to send a message to Vicksburg, which message was sent, consuming only a few minutes, and she was required to enter a note as to the time the message was sent, and that it was sent at eight-thirty P. M.;

that after this she resumed the conversation with Floyd, and that they had been conversing but a short time when Floyd's daughter, Cuell, called her and asked her to get her daddy and send him home as something terrible had happened; that the witness (the telephone operator) asked Floyd if he caught what Cuell said, and he said he did not and asked her to tell him, which she did; that Floyd hung up the receiver, and in a few moments passed in his car going towards his home.

Dr. Sigrest was called to the Floyd home near eight-thirty p. m., and testified that within three minutes he was in the home; that Mr. Floyd stated, when the doctor arrived, to hurry, and that he had taken an hour and a half to get there; that he went into the house, and into the dining room where Mrs. Floyd was lying on the floor, examined her wounds, and saw two wounds inflicted upon her head, which, from the examination he could make, appeared to be a star fracture of the skull; that he dressed the wounds as quickly as he could, and instructed Floyd to get her to a hospital as fast as possible, and that Floyd and his daughter left in his car with Mrs. Floyd at about nine P. M.

Mrs. Floyd testified that she was rendered unconscious by the blow on the head, but that on the trip to Jackson to the hospital she heard her daughter say to the appellant, "I know I have heard Mama say a few things about Mrs. Scott, but poor mama," and that Floyd told her to hush up. On the following morning, the daughter testified that she (Mrs. Floyd) told her she did not know who did it, but she thought her daddy (appellant) did; that the daughter protested against the accusation against her father. Another witness testified that she visited Mrs. Floyd in the hospital, that she knew Mrs. Floyd from a business standpoint, as Mrs. Floyd traded in the store where the witness worked, and that Mrs. Floyd told her she did not know who struck her.

The attending physician, Dr. Crisler, also testified that

Mr. Floyd told him to spare no expense, and that he (Dr. Crisler) asked Mrs. Floyd who did it, and she stated she did not know. He testified that her skull was fractured and had to be trephined, and that she was unconscious when she came to the hospital and for some time after she reached there; that, in his opinion, the wounds could not have been self-inflicted.

Mrs. Black, who lived next door to the Floyds, and her daughter and son, all testified. Mrs. Black stated that her eyes are bad, and that it is the custom for her daughter to read to her an hour in the evening, and that at eight-thirty p. m., on the night in question, her daughter stated the hour was up, and about that time she heard a scream over at the Floyds, but could not state whether it was a child or woman, but that it was not a man; that there was considerable commotion in the Floyd home, and she heard Cuell say, "Daddy, why did you do it," and he told her to shut up. She also heard the call put in for Dr. Sigrest and heard Floyd call Jackson, and heard him state that a negro did it, as a negro had been prowling around the place, and he requested that bloodhounds be sent to his residence. The son and daughter of Mrs. Black corroborated this testimony in detail, and all three testified to the disharmony existing in the Floyd home, and his misconduct on many prior occasions. All stated that he cursed and whipped his children and cursed his wife, showing that their domestic life was turbulent, and that Floyd was tyrannical toward his family.

Dr. Sigrest further testified that when he reached the Floyd home he was told that a man named Marshall inflicted the injury, or had it done.

C. N. Floyd testified, and he is supported by the telephone operator, that he put in a call for Gant's bloodhounds, and, finding they could not be had, Cooper, a man who owned bloodhounds, was called to send them to the Floyd home. Cooper accompanied them and testi-

fied that his hounds were trained and reliable, one of them having been trained at Parchman, the state farm, and he had trained the others, and that, when taken to where Mrs. Floyd was wounded, they followed a track to the barn, and lost it. When brought back to the scene of the injury the dogs followed another track which appeared to go over the fence to a negro house near by on a place owned by a Mr. Lane. Cooper testified that, when they reached this negro house, they indicated they had found the person trailed, and Mr. Lane came down there and said his negro was all right, and was not guilty.

Floyd further testified that he called the city marshal before leaving Flora to come and take charge of his premises, and keep people away until the hounds arrived. The evidence shows that the marshal did go to his (Floyd's) home, and that Lane and others were there at the time the bloodhounds arrived. Floyd testified that when he reached Jackson he called Mayor Scott, and asked him to send Mr. Chancellor, the city finger print expert, to take pictures of any that might be material; that Mayor Scott declined to permit Mr. Chancellor to go, but recommended to him the Globe Detective Agency, which the mayor said was reliable, and had finger print experts in its employment. Floyd called this agency, and it sent one expert to Flora; but when he arrived at that place the marshal and others in charge refused to let him take finger prints on the premises. However, he saw a deputy sheriff pick up the ax by strings, and, while holding it, the expert turned his finger print machine on the ax helve, and got finger prints at two points; but when the light from the machine shone on the ax he was ordered away. He also took the finger prints of Floyd and compared them with the prints on the ax helve; and found that the latter were not Floyd's finger prints. Although Mayor Scott refused to permit Mr. Chancellor to go to Flora, the sheriff of

Madison county procured him, and he took finger prints of the ax helve and of C. N. Floyd, and Mr. Chancellor testified that they were not the same.

Mr. Miley, the Globe detective finger print expert, went to the place where Mrs. Floyd then was, in company with a deputy sheriff, and requested permission to take her finger prints, which she refused. It appeared that her finger prints were not taken by any expert in the case.

Mrs. Floyd, when introduced as a witness, in the case, testified that on four occasions Floyd had whipped her, giving the details of these beatings; and she also testified that, on one occasion, he brutally beat one of their children, a son, because he was too small to do the work assigned to him by C. N. Floyd, and, because she protested against this brutal beating, he whipped her with a razor strop. She also testified that he would not furnish her with suitable clothing, and that she could not go about like other people on account of insufficient clothing. She was contradicted about her clothing by a saleswoman working in Jackson, who testified that Mrs. Floyd frequently purchased goods at the store, having a charge account there. Mrs. Floyd testified that she had this charge account in Jackson, and one in Flora, but she knew not to buy much. While Mrs. Floyd was on the stand, certain letters were produced, one of which was written on the day of her injury, which strongly indicates an expectation of dying, or of committing suicide, and gives directions about putting her body away in a cheap white robe in a plain pine coffin, saying that she did not want to be an expense to her husband, complaining in the letter of his treatment of her, and stating that she had expressed a desire to be put away after the fashion stated in her letter, and that her husband had made a very disparaging statement (contained in the letter) which wounded her feelings most grievously, and expressing a hope that others would receive better treat-

ment, and expressing solicitude for her children. She first denied writing this letter, and then admitted she wrote it. The letters were found by her daughter, Cuell, more than two months after the assault.

Dr. Sigrest further testified that he had treated Mrs. Floyd a number of times for hysteria; that about seventy-five per cent. of the women, in his opinion, were hysterical at times. He testified that people affected with hysteria were imaginative and often did not tell the truth, because of this hysteria which produced a kind of delusion.

Dr. Crisler, who treated Mrs. Floyd, testified that she was hysterical, and that the testimony of hysterical people could not be depended upon.

As to the first assignment of error, that the evidence was insufficient, we think the evidence is for the decision of the jury.

It is true that there are material discrepancies in, and contradictions of, Mrs. Floyd's testimony, but she testified positively that she saw her husband, and that he was the man who struck the blows. Dr. Crisler's testimony is to the effect that the blows could not have been self-inflicted.

The letter and testimony about hysteria were introduced on the theory that Mrs. Floyd inflicted her own injury in an attempt to commit suicide.

It is also true that C. N. Floyd and his children, while on the stand, contradicted Mrs. Floyd's testimony, but the children were minors, the oldest sixteen years old, and the jury might infer that these minors, falling under the control of their father, C. N. Floyd, after the assault, Mrs. Floyd having gone to her people, were influenced by their father, and that his own testimony was false because his interest was at stake.

There is much testimony, pro and con, but it is difficult to state the substance of everything that was said by anybody in an opinion without undue prolixity.

We think, on competent proof, that it was a question for the jury as to whether Mrs. Floyd's version of the assault is true, and that the testimony was of such nature as to make it highly probable that the jury was unduly influenced by the testimony as to other abuses and violent treatment; and that it was error to introduce the four assaults and the prior treatment disconnected with the present trial.

Of course, what happened when Floyd returned home, as testified to by Mrs. Floyd, was admissible as showing his state of mind and motive to commit crime. The case of Raines v. State, 81 Miss. 489, 33 So. 19, holds that evidence should be confined to the issue joined, and disconnected offenses should not be admitted.

It is true the trial judge did not admit evidence of discord and other assaults in the Floyd home on the theory that it was pertinent to show the guilt of Floyd, per se, but since the defense had been developed on the theory that the wounds had been self-inflicted, and that Mrs. Floyd was hysterical and had inflicted them in an effort to commit suicide, that the facts as to this discord and other assaults were admissible on this issue to show the condition of mind of the parties.

We have been cited to no authorities holding that prior offenses by a defendant toward an adverse witness are admissible in evidence for such purpose. In the case at bar, the evidence of the mental condition should be confined to the question as to whether Mrs. Floyd was hysterical, and not why she became so. The mental condition of a witness is only admissible for the purpose of affecting the credibility of the witness, or to show a disposition to commit suicide. That issue varies from the main issue in the case to a collateral or subsidiary issue or issues. We have made a search on our own account and have found no authority justifying the admission for such purpose of other offenses against the defendant being tried for a crime. The general rule is that a de-

fendant in a criminal case must be tried alone for the offense for which he is indicted. There are some exceptions to the rule which are well stated in the case of King v. King, 66 Miss. 506, 6 So. 188, 189, where the state had introduced a number of distinct sales of liquor in evidence and the court said: "After the state had proved distinctly one unlawful sale, it was error to admit testimony of other and different sales. The general rule is that the issue on a criminal trial shall be single, and that the testimony must be confined to the issue, and that on the trial of a person for one offense the prosecution cannot aid the proof against him by showing that he committed other offenses. Whart. Crim. Ev., sec. 104; 1 Bish. Crim. Proc., sec. 1120 et seq. The reason and justice of the rule is apparent, and its observance is necessary to prevent injustice and oppression in criminal prosecutions. Such evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and, while the accused may be able to meet a specific charge, he cannot be prepared to defend against all other charges that may be brought against him. 'To permit such evidence,' says Bishop, 'would be to put a man's whole life in issue on a charge of a single wrongful act, and crush him by irrelevant matter, which he could not be prepared to meet.' 1 Bish. Crim. Proc.. sec. 1124. There are exceptions to the rule which has been stated, such as where the offense charged and that offered to be proved are so connected as to constitute but one transaction, or where it is necessary to identify the offender, or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge and the like. but none of these exceptions apply here. Id. sec. 1129; Gassenheimer v. State, 52 Ala. 313; State

v. Crimmins, 31 Kan. 376, 2 Pac. 574; Lebkovitz v. State, 113 Ind. 26, 14 N. E. 363, 597, and authorities there cited.''

The same principles are announced in numerous other cases. See Collier v. State, 106 Miss. 613, 64 So. 373; Baygents v. State, 144 Miss. 442, 110 So. 114; McLin v. State, 150 Miss. 159, 116 So. 533; Dedeaux v. State, 125 Miss. 326, 87 So. 664; McGee v. State (Miss.), 22 So. 890; Dabney v. State, 82 Miss. 252, 33 So. 973; Whitlock v. State (Miss.), 6 So. 237, and Herman v. State, 75 Miss. 340, 22 So. 873.

Many other cases from this state could be cited, but we think the rule announced in these cases is so clear and explicit that they will suffice. The rule at common law was that a defendant could only be tried for one particular crime, and it is so vital to the fair and just administration of criminal law that we are not disposed to ingraft new exceptions upon it. Whenever other offenses are necessary to be disclosed in proving an essential element of crime, the fact that another offense was committed does not prevent the evidence that is otherwise relevant and competent from being introduced, but there must be some connection between the offense being tried and the offense shown to have been committed prior to that time. Sometimes offenses are so interrelated and so interdependent that this is justified, but, in the case at bar, the prior offenses and conduct were not connected with the transaction.

While the judge in the court below intended this proof to be limited to a particular phase of the case, we think it was impossible for it to be so limited in the minds of ordinary jurors untrained in legal reasoning. It was manifestly highly prejudicial.

We think the proof in this case was of such character that most jurors would likely convict the defendant on general principles.

We also think it was error to have excluded Dr. Sigrest's professional opinion as to whether or not, if one

blow was inflicted, the second could not have been self-inflicted. This testimony shows clearly that, if the most aggravated wound was first inflicted, the other could not have been self-inflicted.

It was for the jury to consider, and we are unable to say the jury did not have the right to have reached a conclusion under this proof that Mrs. Floyd may have inflicted the injuries upon herself. We do not by any means intend to say that the jury would have found this, or that we would so hold, were we trying the case as jurors.

It is true that Dr. Crisler may have had more experience as a surgeon, or higher training as a student, but Dr. Sigrest had been trained as a general practitioner and had had thirty years' experience. In King v. King, 161 Miss. 51, 134 So. 827, we held that to testify as an expert a witness need not be infallible, or possess the highest degree of skill, it being generally sufficient that he possess peculiar knowledge respecting matter involved not likely to be possessed by the ordinary layman. We do not think the matter here involved is one which called for infallible knowledge, but that a physician who had made the study of the human body a profession, and who had considerable practice, could be called an expert.

There are, we believe, portions of the brain to which an injury might not paralyze it or destroy consciousness, and other portions where an injury might suspend activities, and injuries to other portions might produce total unconsciousness, and destroy volition. Certainly, a student of medicine might possess knowledge not possessed by ordinary laymen.

We think these errors are sufficient to demand a reversal, and that they were aggravated by counsel's argument complained of in the bill of exceptions. We will now set forth these complaints to the argument.

While discussing the instructions for the defendant, counsel said: "This instruction is a sinker instruction,

is for the purpose of getting a sinker to hold out." Objection was made to this language; sustained by the court, and the jury was instructed not to consider the same. Counsel also said: "Well, I will say it a feeder, and I know Judge Potter will not stop me and down in his heart he is with me." Objection was made to this language, sustained by the court, and the jury was instructed not to consider it. Counsel also said: "The defendant was a brute and had four times beaten his wife brutally and unmercifully." Objection was made to this language, sustained by the court, and the jury instructed not to consider it. Thereafter the same attorney further stated that the defendant was a beast who had brutally and unmercifully beaten his wife, to which the defendant objected, his objection was sustained, and the jury instructed not to regard this language. Counsel used the following language: "That the defendant should have summoned Frank Black to prove that his wife and children were not telling the truth when they testified. That Frank Black was in the court room during the trial of the case and should have been put on the stand by the defendant." Defendant objected, his objection was sustained, and the jury instructed not to consider the same. During further argument this language was used: "Floyd's daughter back in the room there told the District Attorney and myself that her father knocked Mrs. Floyd down and beat her unmercifully," to which objection was made, sustained, and the jury instructed not to consider it.

We have held in a number of cases that, where there is improper argument, and the court sustains the objection to the same, and the jury is instructed not to consider it, we will not reverse unless counsel go further and request, before the jury returns its verdict, that the jury be discharged.

There are times when denunciation founded upon competent evidence is permissible. However, there is a wide

difference in the power to denounce and to make reasoned arguments. Arguments based upon reason are to be preferred over arguments based upon passion. The rights of counsel are very great and extend to wide latitudes, as shown in the case of Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817, and the authorities there cited. Exceptions to what is a reasonable latitude are also stated in that opinion and in other opinions of this court upon the subject. Counsel should never belittle the instructions of the court, nor should the court permit them to be disparaged. The court's instructions are the announcement of the court itself in legal contemplation. The object of criminal trials was forcibly stated by Judge Calhoon in Hampton v. State, 88 Miss. 257, 40 So. 545, 546, 117 Am. St. Rep. 740, where, in the conclusion of the opinion, he said as follows: "All must be tried on facts, and not on abuse. Only impartial trials can pass the Red Sea of this court without drowning. Trials are to vindicate innocence or ascertain guilt, and are not to be vehicles for denunciation."

It is a matter of duty to secure a fair trial, and the securing of justice is the object of courts. This object can be best obtained by using reason and fairness, because, under the State Constitution, every person is entitled to a fair and impartial trial in the courts.

In the case of Fisher v. State, 145 Miss. 116, 110 So. 361, 365, we said that: "Perhaps no precise definition can be given it (a fair trial), but it certainly must be one where the accused's legal rights are safeguarded and respected. There must not only be a fair and impartial jury and a learned and upright judge to instruct the jury and pass upon the legal questions, but there ought to be an atmosphere of calm, in which the witnesses can deliver their testimony without fear and intimidation, and in which the attorneys can assert the defendant's rights freely and fully, and in which the truth may be received and given credence without fear of violence."

It is argued that an audience attended the trial and behaved improperly, for which the case should be reversed. The trial judge made a statement, as shown by the record, as to what happened, as did also the sheriff, from which it appears that the only demonstration made by the audience was that they applauded when the state announced it would accept the jury. The audience had waited long and patiently through the process of impaneling the jury, which took considerable time, and only applauded because they thought the jury had been completed and that the trial on its merits would proceed. The judge stated that there should be no more applause. There was no motion to discharge the jury or continue the cause because of this act of the audience. One witness who attended the trial, a lawyer by profession and a student of legal procedure, being in Jackson for the purpose of looking over the field and practice with a view to locating there, indicated that the audience was hostile to the defendant. As long as an audience does not disturb or prevent a fair trial, we cannot control the lower court in its discretion, and tell it when to exercise authority and when not. It is only when it is evident that such authority should be exercised, and it is not, that this court will interfere. The record does not show error in this respect on the part of the court below.

The appellant complained of the following instruction: "The court charges the jury for the state that in trying this case you should not hunt for doubts, with the view of finding some excuse or apology for your verdict, nor should you indulge in such doubts as are merely conjectural; but the doubts which ought to make you pause and hesitate must be reasonable doubts, and they must arise out of the evidence or from the want of evidence in this case. You are not required by the laws of this state to know that the defendant is guilty of the crime charged against him before you can convict, and you should not hesitate to find that he is guilty because you

are able to say, outside of the evidence, that he might have been innocent, but after carefully considering all of the evidence in the case if you believe beyond a reasonable doubt that he is guilty, you should discharge your duty under your oaths, and under the law, and say so by your verdict.''

The giving of this instruction does not constitute reversible error. It could have been refused. It does not, as said in another case, shed any light upon the case, but we would not reverse for this instruction.

After considering all the errors assigned, and after pointing out all that we think are necessary to be set forth, we think that, for the errors indicated, the judgment of the court below must be reversed, and the cause remanded for a new trial.

Reversed and remanded.