# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-01381-SCT

*CHAD BOWMAN a/k/a OSCAR CHAD BOWMAN*
*a/k/a CHADWICK BOWMAN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/2017 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | WILBUR O. COLOM |
| | TOMMY RAY SAVANT |
| | ROBERT THOMAS RICH |
| | SCOTT WINSTON COLOM |
| | STANLEY ALEXANDER |
| | KIMBERLY TAFT PURDIE |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JULIE ANN EPPS |
| | ROBERT THOMAS RICH |
| | TOMMY RAY SAVANT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| SPECIAL PROSECUTOR: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STANLEY ALEXANDER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED AND REMANDED - 10/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. A jury convicted Chad Bowman of one count of burglary of a dwelling—a hunting camp where his wife had stayed during the early part of Mississippi's bowhunting season.

On appeal, Bowman argues the State failed to sufficiently prove the hunting camp was, at the time of the alleged burglary, a dwelling house. Bowman does not dispute that, under Mississippi law, a hunting camp may be considered a dwelling house. Instead, Bowman argues the hunting camp was not Emily Anne's dwelling house, as charged in the indictment, because she neither owned the hunting camp—Southland Tube did—nor did she intend the hunting camp to be her permanent residence. After review, we find the State sufficiently proved Emily Anne was residing in the hunting camp when Bowman broke in. That is all Mississippi law required. And the indictment's allegation that the hunting camp was owned by Southland Tube was mere surplusage, which the State still proved beyond a reasonable doubt.[1]

¶2. We affirm Bowman's conviction. But because of the apparent confusion over the length of time Bowman must serve, we remand the case for resentencing.

**Background Facts and Procedural History**

¶3. In Mississippi, bowhunting season for deer begins in October. And Emily Anne Chenoweth (formerly Emily Anne Bowman) spent many days in October 2014 at the Southland Plantation hunting camp to bowhunt. During this time, she also helped her mother renovate and update the camp. The hunting camp also served as Emily Anne's escape from a rapidly deteriorating and abusive relationship with her husband, Chad Bowman. In the early morning hours of October 18, 2014, Bowman broke into the hunting camp and attacked Emily Anne and the camp's caretaker, Wayne Stewart, Jr. This episode ended with Bowman

---

[1] *See **Taylor v. State**, 214 Miss. 263, 266, 58 So. 2d 664, 665 (1952).*

being charged with burglary, aggravated assault, and attempted murder. Bowman was convicted of burglary and acquitted of the remaining charges.

## I.     Emily Anne and Bowman's Marriage

¶4.     Emily Anne and Bowman married in February 2010 and lived in Canton, Mississippi. Shortly after their marriage, Bowman began "self-medicating" with marijuana, prescription drugs, and alcohol to "control his anger." But according to Emily Anne, Bowman remained angry and controlling, particularly about the couple's finances. In October 2014, Bowman's outbursts over money and other issues began to escalate and turned physical. Emily Anne testified Bowman's drug and alcohol use increased. And she started spending more time at the hunting camp to hunt and to get away from Bowman.

¶5.     Southland Plantation is a hunting camp outside Macon in Noxubee County, Mississippi, owned by Southland Tube, Inc. Because Emily Anne's father, David Chenoweth, worked for Southland Tube, she had permission to use the camp. She just had to give advance notice either to her father or to Wayne.

¶6.     Emily Anne stayed at the camp from October 1 to October 5. When she returned to Canton, Bowman was upset she had only worked Monday and Tuesday that week and had been paid only for those days. On October 7, 2014, Bowman became enraged at Emily Anne about money and grabbed her to keep her from leaving. Bowman bruised her arms and legs in that encounter. The next day at work, she told her coworker Anna Fumbanks, who took pictures of the bruises. Emily Anne rejected Fumbanks's advice to call the police. Emily Anne finished the work week and returned to the camp the weekend of October 11 and 12.

3

¶7.    Emily Anne planned to return to the hunting camp the evening of October 17, intending to stay through October 19.  As Emily Anne tells it, that Friday night, she told Bowman they should see a marriage counselor and suggested he get medication to balance him out.  If he did not, she would leave him.  Bowman reacted by screaming at her.  He warned her that if she left, she would not be coming back.  When she tried to leave in her car, he reached in and pulled her out.  She fell to the concrete and Bowman dragged her on the pavement until she broke free and escaped back to her car.  She then left for the hunting camp.  When she arrived, she found the camp locked.  So she went to wake Wayne.  Wayne followed her to the camp house and unlocked it for her.  And the two sat on the couch and talked about the episode in Canton earlier that night.  Eventually, they fell asleep next to each other on the couch.

## II.    October 18, 2014

### A.    Bowman's Version

¶8.    According to Bowman, the night of October 17, he and Emily Anne had dinner.  They talked about her going hunting that weekend and discussed finances.  He testified their conversation was not pleasant, but there was no yelling or screaming.  Emily Anne later packed up her bow, a hunting bag, and a bag of clothes, then headed to the hunting camp. The two also exchanged text messages and talked on the phone before she arrived in Macon.

¶9.    Bowman claims that when he woke at 3:00 a.m. on October 18, he checked his phone and saw a text message from Emily Anne saying she was at the hunting camp.  Bowman testified he tried to call Emily Anne six times to "just talk to her and make sure she made it

4

okay." But she did not answer. So Bowman decided to get in his car around 3:15 a.m. and drive to Macon. He arrived around 5:00 to 5:15 a.m.

¶10. Bowman testified he saw Emily Anne's car and Wayne's truck in the driveway. He got out and went to the front door. He saw that the television was on. He also saw an empty wine bottle with two wine glasses on the coffee table. And he noticed there were no pillows on the couch. Since the front door was locked, he walked to the back of the camp and entered through an unlocked sliding glass door. The door to the master bedroom upstairs was closed. So he walked upstairs, opened the bedroom door, and flipped on the lights. When he pulled the bedcovers off, he saw Emily Anne and Wayne in bed together, naked. Both Emily Anne and Wayne jumped out of bed. And Bowman punched Wayne in the jaw.

¶11. After recovering from the punch, Wayne rushed him. Bowman grabbed Wayne by the neck and choked him until he fell to the ground. Bowman then went downstairs. He claimed he phoned David Chenoweth to say he had caught Emily Anne and Wayne in bed. When Wayne started coming downstairs, Bowman hung up. Wayne rushed Bowman, so he hit Wayne again. As Bowman left the house, Wayne put a gun to his head. Bowman turned to face Wayne, said a few words, and then headed for his car. Wayne got in his truck and left. Emily Anne got in her car and followed Bowman to a nearby gas station before returning to the hunting camp.

### B. Emily Anne's Version

¶12. Both Emily Anne and Wayne tell a different story. They claim they were asleep on the couch and they both woke when Bowman entered the camp house. Bowman immediately

5

pulled Wayne over the back of the couch and began choking him. As Wayne blacked out, Bowman told Emily Anne that he had killed Wayne. Bowman then turned to Emily Anne and began choking her. But Wayne regained consciousness. So Bowman released Emily Anne and dragged Wayne over to the dining table. Bowman grabbed a wooden chair and swung it at Wayne. But the chair caught the underside of the staircase. Bowman then dropped the chair and grabbed a shower rod off the table. He beat Wayne with the rod on his arms, hands, and head. He then turned to Emily Anne. But before Bowman could strike Emily Anne with the rod, Wayne grabbed his pistol from the coffee table. Wayne pointed the gun at Bowman and told him to get out of the camp house, which he did. At that point, Emily Anne told Wayne to leave and said that she could handle Bowman.

¶13. As Emily Anne and Wayne walked out of the camp house, they saw Bowman near Emily Anne's car. Wayne got in his truck and was backing out when Bowman approached his passenger window and pointed a pistol he had taken from Emily Anne's car at Wayne. Emily Anne jumped on Bowman's back. Bowman managed to pull her off. He then pulled her head up by her ponytail, said "die bitch," and pulled the trigger. The gun clicked but did not fire. He then released Emily Anne. Afterwards, both Emily Anne and Wayne saw Bowman sitting down, pointing the gun underneath his chin.

¶14. Bowman eventually stood up and asked Emily Anne to follow him to a gas station. All three left the hunting camp. Emily Anne followed Bowman to the gas station but did not stop. Instead, she continued driving and found an open field where she called her father and cried for a long time.

### III.  Trial

¶15.   The hunting-camp events formed the basis of Bowman's indictment and trial for attempted murder, burglary, and aggravated assault.  After each side presented its case, the State and defense discussed jury instructions with the court, eventually agreeing on most instructions.  The judge then instructed the jury.  After deliberating, the jury found Bowman guilty of burglary but not guilty of attempted murder or aggravated assault.  The judge ordered a presentencing investigation.  He considered the victim's impact statement, and heard mitigation testimony from Bowman's children, his father, his first wife, and Bowman himself.  The judge sentenced Bowman to a term of twenty years in prison, with ten years suspended and five years of post-release supervision.  Bowman filed a motion for a new trial, but the judge denied his motion.  Bowman appealed.

### Discussion

¶16.   Bowman claims: (1) the evidence was insufficient to support a burglary conviction; (2) the jury's verdict was against the weight of the evidence; (3) the trial court failed to give two jury instructions; (4) the judge admitted improper Rule 404(b) evidence; and (5) his sentence was based on misapplied or misunderstood law.  After review, we find Bowman's burglary conviction is supported by the sufficiency and weight of the evidence.  We find Bowman waived any challenge to his newly proposed jury instructions by not requesting them at trial.  We also find the trial judge did not abuse his discretion by admitting the assault-based evidence under Rule 404(b) of the Mississippi Rules of Evidence.  As to Bowman's prior alcohol and drug use, even if that evidence was wrongly admitted, any error

7

was at most harmless. We do, however, find the judge apparently misconstrued the sentencing law, which has recently been clarified by this Court. We affirm Bowman's conviction for burglary but remand the case for resentencing.

## I. Sufficiency of the Evidence

¶17. Bowman first argues the State failed to prove beyond a reasonable doubt the essential elements of dwelling-house burglary.

### A. Dwelling House

¶18. Burglary of a dwelling house is a distinct statutory crime from burglary of a non-dwelling house. *Compare* Miss. Code Ann. § 97-17-23 (Rev. 2014) (burglary of a dwelling house) *with* Miss. Code Ann. § 97-17-33 (Rev. 2014) (burglary of other buildings). *See also Woods v. State*, 186 Miss. 463, 191 So. 283, 284 (1939). So the fact the hunting camp was, at the time of the alleged burglary, a dwelling house was an essential element of the crime the State had to prove beyond a reasonable doubt. *Carr v. State*, 770 So. 2d 1025, 1029 (Miss. Ct. App. 2000).

¶19. Here, Bowman does not dispute that under Mississippi law a hunting camp may be considered a dwelling house. *Young v. State*, 952 So. 2d 1031, 1033-34 (Miss. Ct. App. 2007) (affirming that a fully furnished and stocked hunting cabin was a dwelling house); *Campbell v. State*, 883 So. 2d 115, 118-119 (Miss. Ct. App. 2004) (same). *Cf. Gillum v. State*, 468 So. 2d 856, 859 (Miss. 1985) (holding that a frequently and regularly visited weekend coastal home was a dwelling house). But he does contend that the State failed to prove it was *the* "dwelling house of Emily Anne," as was charged in the indictment and

8

instructed to the jury.[2] Bowman argues the hunting camp was not Emily Anne's dwelling house because she neither owned the hunting camp—Southland Tube did—nor did she intend it to be her permanent residence.

¶20.   But contrary to Bowman's assertions, the State did not have to prove Emily Anne owned the hunting camp—only that she occupied it.  "Possession is enough as against burglars."  *Lewis v. State*, 85 Miss. 35, 40, 37 So. 497, 497 (1904) (citing Wharton's Criminal Law § 804 (10th ed.) (holding that indictment's charge and the State's proof of ownership of the building was sufficient because the person charged with ownership "used and occupied" the building at the time of the burglary)).  This is because, "[a]t common law, burglary was considered to be an offense against habitation rather than against property," and "what was sought to be protected was the peace of mind and security of the residents, rather than the property."  *Robinson v. State*, 364 So. 2d 1131, 1133 (Miss. 1978) (quoting 85 A.L.R. 428 (1933)).  *Cf. Taylor v. State*, 214 Miss. 263, 266, 58 So. 2d 664, 665 (1952) ("This Court has held in several cases that in an indictment for burglary the allegations as to the ownership of the title to the building constitute surplusage, and, insofar as the burglary is concerned, the occupant of the building at the time of the burglary is the owner . . . ." (citing *Clinton v. State*, 163 Miss. 435, 142 So. 17 (1932); *Davis v. State*, 173 Miss. 783, 163 So. 391 (1935)).  Here, the State sufficiently proved Emily Anne was residing in the hunting

---

[2] The indictment charged that Bowman "did unlawfully, willfully, feloniously and burglariously break and enter the dwelling house of Emily Bowman, owned by Southland Tube, Inc., with the intent to commit a crime therein, to-wit: assault, in violation of [Mississippi Code Section] 97-17-23 . . . ."  And the jury instruction on this count tracked the language of the indictment.

camp when Bowman broke in. That is all the law required. And the allegation in the indictment that the hunting camp was in fact owned by Southland Tube was mere surplusage, which the State nonetheless proved at trial beyond a reasonable doubt. *See Taylor*, 58 So. 2d at 665.

¶21. Also contrary to Bowman's assertions, the State did not have to prove the hunting camp was Emily Anne's permanent, continuous residence. As support for his permanent-residence argument, Bowman cites *Robinson v. State*. But the facts of *Robinson* are inapposite. That case dealt with a motel room, which the Court found was not the dwelling house of a woman who had rented it in the wee hours of the night to share with a man she had met at a club. *Robinson*, 364 So. 2d at 1132-34. However, the Court noted, "[i]n the event there is permanent dwelling of a person or his family *in a hotel or motel*, that would be his dwelling house." *Id.* at 1134 (emphasis added).

¶22. Here, we are not dealing with a hotel or motel room. We are dealing with a house. And this Court has long-held that "[a] building which is in fact a dwelling-house does not lose its character as such by a mere temporary absence of its inhabitants who have left with intent to return . . . ."[3] *Scott v. State*, 62 Miss. 781, 782 (1885). Further, "[t]he seasonal or intermittent use of a residence . . . does not prevent it from becoming a dwelling." *Gillum*, 468 So. 2d at 859.

___

[3] This principle is not unique to Mississippi. Under Georgia law, "[t]here is no requirement in the law that a house be continuously occupied in order to be a 'dwelling'. It is sufficient that it is occasionally occupied for residential purposes and any such lawful occupant has a superior right as against burglars for the purpose of an indictment." *Montgomery v. State*, 195 S.E.2d 784, 785 (Ga. Ct. App. 1973) (citing *Houston v. State*, 38 Ga. 165 (1868)).

10

¶23.   In *Gillum*, this Court recognized that "a person may simultaneously have two dwellings subject to burglary and sometimes reside with his family in one and sometimes in the other." *Id.* at 860.  So the fact Emily Anne considered the marital home she shared with Bowman in Canton her residence did not foreclose the hunting camp that she seasonally used from also being her dwelling.  *See also Washington v. State*, 753 So. 2d 475, 478 (Miss. Ct. App. 1999) (holding that a Mississippi house regularly visited by a Wisconsin woman was "a dwelling as contemplated by the burglary statute").  Emily Anne testified that, during bowhunting season, she had spent the weekends and some weekdays leading up to the burglary at the hunting camp with her mother, who was living there while it was being renovated.[4]  Before her fight with Bowman earlier that night at their Canton home, Emily Anne had already planned to spend the weekend at the camp.  So her intent was to return to the camp that weekend, making it her dwelling.  *See Scott*, 62 Miss. at 782.

### B.    Consent

¶24.   Next, Bowman asserts—for the first time on appeal—the State failed to prove he lacked consent to enter the hunting camp.  He argues "'there can be no breaking, and therefore there is no burglary where the occupant of a house, or an agent or servant having authority, expressly or impliedly invites or consents to the entry.'" *Holderfield v. State*, 215 Miss. 564, 569, 61 So. 2d 385, 386 (1952) (quoting 12 C.J.S. *Burglary* § 12).  As Bowman pitches it, the State was mandated to prove he lacked express or implied permission to be at the hunting camp that night.  But he is wrong that this is an element of burglary the State

_____

[4] Emily Anne's testimony suggests that her mother would have been at the hunting camp that weekend were it not for a family funeral.

11

must prove.

¶25. Instead, "[c]onsent is an affirmative defense to the charge of burglary rather than an essential element of the offense." 13 Am. Jur. 2d *Burglary* § 54 (2019). Burglary has only two required elements—the "(1) 'breaking and entering the dwelling house or inner door of such dwelling house of another' (2) 'with the intent to commit some crime therein[.]'" *Windless v. State*, 185 So. 3d 956, 960-61 (quoting Miss. Code Ann. § 97-17-23(1) (Rev. 2014)). We note that Bowman *never* argued a consent defense.

¶26. Furthermore, not only do the cases Bowman cites not suggest that the State must prove lack of consent as a required element of burglary, they also contain completely different facts. For instance, in *Mitchell v. State*, although the defendant had broken up with his live-in girlfriend the week earlier and had been staying with his mother, the house he was accused of burglarizing was still his own home. *Mitchell v. State*, 720 So. 2d 492 (Miss. Ct. App. 1998). And the Court of Appeals simply recognized, "[o]ne cannot break and enter his own home . . . ." *Id.* at 495.[5]

¶27. Unlike *Mitchell*, Bowman was not charged with burglarizing his own home. Instead, the evidence showed the hunting camp was owned by Southland Tube and was regularly used by Emily Anne on the weekends to hunt—but always by permission. There was no evidence Bowman had also been given permission to be at the camp with Emily Anne that night. In

---

[5] The same is true in the Ohio Court of Appeals case Bowman cites, *State v. O'Neal*, 658 N.E.2d 1102 (Ohio Ct. App. 1995). That appellate court was dealing with a defendant charged with burglarizing the marital residence. It concluded, absent a restraining order, the evidence had to show both parties had made the decision to live separately and that one spouse was relinquishing their possessory interest in the marital home in order to sustain a conviction of burglary. *Id.* at 1104.

12

fact, Emily Anne told Wayne she needed to get away from her husband.[6] And Bowman himself neither sought nor was granted permission to enter the camp.

¶28. Bowman broke into the camp through an unlocked door after spying through a window and seeing what he claims was evidence of Emily Anne's unfaithfulness. And Bowman's own testimony supports that he lacked permission from one of the camp's agents or occupants to be there that night. We find sufficient proof supports the jury's verdict that he broke into the hunting camp with intent to commit a crime inside.

## II. Weight of the Evidence

¶29. Bowman next argues that if this Court rejects his sufficiency claim, it should still reverse and remand based on the weight of the evidence.

¶30. This Court does not reweigh evidence nor does it determine a witness's credibility. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). When evidence conflicts—as it obviously does here—it is for the jury to decide witness-credibility issues and what weight and worth their testimony holds. *Id.* This Court's responsibility is to review the trial court's grant or denial of a new trial for abuse of discretion. *Id.* And this Court will only disturb a verdict that, when viewing the evidence in the light most favorable to the verdict, is so contrary to the overwhelming weight of the evidence that it sanctions an unconscionable injustice. *Id.*

¶31. We see no abuse of discretion in the judge's denial of Bowman's motion for a new trial. Emily Anne and Wayne both testified that Bowman entered the hunting camp where

---

[6] Bowman also insists his "conjugal rights" as Emily Anne's spouse included the right to enter any place where Emily Anne had been admitted. But Bowman cites absolutely *no law* for the proposition that one cannot commit burglary in a place where one's spouse has consent to be.

13

they were staying, without permission, and assaulted them. Bowman's own testimony confirms that he arrived at the camp around 5:00 a.m., saw evidence he claims showed his wife's unfaithfulness, and entered the camp through an unlocked back door. Viewing this evidence in the light most favorable to the verdict, we find it supports Bowman's burglary conviction.

### III. Jury Instructions

¶32. Bowman also claims the trial court reversibly erred by not giving two instructions for the burglary charge. These instructions dealt with Bowman's permission argument and the definition of "dwelling house."

¶33. We review the trial court's decisions on jury instructions for abuse of discretion. *Lofton v. State*, 248 So. 3d 798, 809 (Miss. 2018). This, however, is the first time any court has heard Bowman's new instructions request. He did not seek either of these instructions at trial. And this Court will not hold a trial judge in error for instructions never requested. *Id.* at 810.

#### A. *Knowledge, Permission, or Consent Instruction*

¶34. His first instruction complaint involves his claim that he had no knowledge he lacked express or implied consent or permission to enter the camp—an essential element the jury should have been instructed on. But Bowman acknowledges he did not seek this instruction. Indeed, at trial, Bowman withdrew his own jury instruction on the elements of burglary in favor of the State's. He instead agreed the State's instruction covered the elements of burglary. We also agree. And thus, we see no error here.

14

### B.    *Dwelling House Instruction*

¶35.    Bowman's next argument is that the judge should have defined "dwelling house" for the jury.  A trial court is not required to give the jury sua sponte instructions or instructions supplementing those requested by the parties.  ***Harris v. State***, 861 So. 2d 1003, 1017 (Miss. 2003).  Thus, the trial court cannot be held in error.  And while the parties discussed definitional and limiting instructions at some length, Bowman never requested an instruction to define "dwelling house" for the jury.  So his argument he is entitled to such an instruction is also waived.

### IV.    Rule 404(b) Evidence[7]

¶36.    Bowman's next challenge is over the judge's Rule 404(b) rulings.  Specifically, Bowman argues the trial court erred by admitting evidence of his prior assault of Emily Anne and his drug and alcohol abuse.  Bowman claims this improper character evidence unduly prejudiced him, resulting in his burglary conviction.

¶37.    This Court reviews evidentiary calls for abuse of discretion.  ***Hargett v. State***, 62 So. 3d 950, 952 (Miss. 2011).  "'A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence.'"  ***Id.*** (quoting ***Price v. State***, 898 So. 2d 641, 653 (Miss.

---

[7] Bowman appears to raise two other evidentiary errors while discussing the Rule 404(b) evidence.  First, he claims the State waived its argument that the prior assault was admissible to show intent.  But he declares this without analysis or authority, so this Court need not consider the argument.  *See **Arrington v. State***, 267 So. 3d 753, 756 (Miss. 2019).  Second, he claims the trial court incorrectly allowed hearsay testimony under the excited-utterance exception. The judge allowed Anna Fumbanks to testify that Emily Anne told her it was Bowman who had committed the assault.  But even if this was error, it is harmless since Emily Anne had already testified that Bowman caused those bruises depicted in the pictures taken by Anna.

15

2005)). Even if there is error in the admission, this Court will affirm "'unless the error adversely affects a substantial right of a party.'" *Id.* (quoting *Ladnier v. State*, 878 So. 2d 926, 933 (Miss. 2004)).

*Evidence of Other Crimes, Wrongs, or Acts*

¶38. Generally, Mississippi's evidentiary rules do not permit evidence of other crimes, wrongs, or acts to prove a person's character to show he or she acted in conformity therewith. Miss. R. Evid. 404(b)(1). But there are a variety of exceptions to this prohibition. Most are found in Rule 404(b)(2), which specifies evidence of other crimes, wrongs, or acts, *may* be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Miss. R. Evid. 404(b)(2). The "[p]urposes listed in Rule 404(b) are not exhaustive . . . ." *Johnson v. State*, 204 So. 3d 763, 768 (Miss. 2016) (citing *Green v. State*, 89 So. 3d 543, 549 n.12 (Miss. 2012)). They are, however, specific rule-based "examples of noncharacter purposes for which evidence of other crimes, wrongs, or acts may be admitted." *Id.* (citing *Green*, 89 So. 3d at 549 n.12). Trial judges also have discretion to admit "[e]vidence of other crimes or bad acts" for reasons not listed in Rule 404(b)(2), like "tell[ing] the complete story so as not to confuse the jury." *Palmer v. State*, 939 So. 2d 792, 795 (Miss. 2006).[8]

¶39. Still, regardless of its origin, before a judge admits other-acts evidence, it must be

---

[8]In *Brown v. State*, this Court explained the State has a "legitimate interest in telling a rational and coherent story of what happened . . . ." *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986) (internal quotation marks omitted) (quoting *Turner v. State*, 478 So. 2d 300, 301 (Miss. 1985)). When substantially necessary to present to the jury the complete story of the crime, evidence or testimony may be given even though it may reveal or suggest other crimes. *Simmons v. State*, 813 So. 2d 710, 716 (Miss. 2002).

16

filtered through Mississippi Rule of Evidence 403. Under Rule 403, when weighing admission of relevant evidence, a trial judge "*may* exclude relevant evidence if its probative value is substantially outweighed by [the] danger of . . . unfair prejudice . . . ." Miss. R. Evid. 403 (emphasis added). These admissibility determinations are permissive and discretionary on the trial judge's part.[9] This discretion is necessary because Rule 403 "'does not mandate exclusion'" of highly prejudicial relevant evidence. ***Burleson v. State***, 166 So. 3d 499, 508 (Miss. 2015) (quoting ***Jones v. State***, 904 So. 2d 149, 152 (Miss. 2005)). Rather, the rule is clear that such evidence "may be excluded." ***Id.***

### A. Prior Assault

¶40. This Court need not look hard to see that evidence of prior threats and assaults has been deemed probative to show intent.[10] In ***Stone v. State***, the defendant was tried for the aggravated assault of his sister. ***Stone v. State***, 94 So. 3d 1078, 1080-81 (Miss. 2012). The judge allowed the State to introduce Stone's prior threats and attacks against his sister. These acts were offered to tell a complete story and to show his intent and motive, among other reasons. ***Id.*** On appeal, Stone claimed these admissions were erroneous. But this Court

---

[9] "Where a trial court determines that potentially prejudicial evidence possesses sufficient probative value, it is within that court's sound discretion whether or not to admit [it.]" ***Jones v. State***, 904 So. 2d 149, 152 (Miss. 2005) (citing ***Baldwin v. State***, 784 So. 2d 148, 156 (Miss. 2001)).

[10] Bowman points to three older cases in which evidence of prior assaults was deemed inadmissible: ***Floyd v. State***, 166 Miss. 15, 148 So. 226 (1933); ***Raines v. State***, 81 Miss. 489, 33 So. 19 (1902); and ***Herman v. State***, 75 Miss. 340, 22 So. 873 (1898). But in each of these cases, this Court found the evidence was remote in time, factually unconnected, or, as in ***Herman***, unsupported. But more importantly, these cases predate our Rules of Evidence, which instruct how prior-acts evidence must now be handled.

disagreed. It found the past threats and assaults were probative in determining the defendant "knowingly acted"—an element of aggravated assault. *Id.* at 1084-85. They were also admissible to show his intent, motive, and common plan or scheme. *Id.*

¶41. The judge here made similar findings. The State sought to admit evidence that Bowman's temper had been escalating and that he assaulted Emily Anne mere days before the charged crimes. The judge found the testimony and exhibits showing Emily Anne's bruises from that prior assault were probative to prove Bowman's intent—a necessary element of attempted murder.[11] And after filtering this evidence through Rule 403, the judge found it was more probative than prejudicial. We see no error in this finding.

¶42. The judge also granted Bowman's proposed limiting instruction about the prior

---

[11] Mississippi Code Section 97-1-7(2) defines attempted murder as,

> Every person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under Section 97-3-19, but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder and, upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict after a separate sentencing proceeding. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than twenty (20) years in the custody of the Department of Corrections.

Miss. Code Ann. § 97-1-7(2) (Rev. 2014).

An attempted crime consists of three element: (1) an *intent* to commit a particular crime; (2) an overt act towards committing the crime; and (3) the failure to complete the commission of the crime. *Green v. State*, 269 So. 3d 75, 82 (Miss. 2018). So determining Bowman's intent was necessary to prove an element of attempted murder.

assaults.[12] To the extent Bowman claims error in his limiting instruction, we point out Bowman both drafted and requested this specific instruction. Thus, he cannot now claim the court erred in giving it.

¶43. We find the judge did not abuse his discretion in admitting the prior-assault evidence as proof of Bowman's intent.

### B.    Drug & Alcohol Use

¶44. Bowman also claims error in the admission of his prior drug and alcohol use.

### i.    Completing the Story

¶45. The State sought to admit evidence of Bowman's increasing drug and alcohol use to show his frame of mind because his verbal and physical abuse of Emily Anne had escalated days before the October 7 assault and the hunting-camp burglary. The State argued Bowman's then-daily drug use to self-medicate his anger issues was a motivating factor when the prior assault took place. The trial judge was not immediately sure of its relevance. He excluded any testimony about Bowman's supposed drug dealing. And he made clear he would not allow the State to mention Bowman's alcohol and drug use as a "gratuitous attempt to show [Bowman] is a bad guy or something like that."

¶46. But the judge found it necessary to study additional caselaw during a recess. After doing so, he made a conditional ruling that "the probative value" of evidence of Bowman's

---

[12]The trial court instructed the jury that if it believed the prior abuse allegations, they may only be considered "for the limited purpose of establishing CHAD BOWMAN's intent to commit the crime of Attempted Murder. . . ." The jury was instructed it "cannot and must not" infer that Bowman "acted in conformity with those previous acts" as proof of guilt "of the charges for which he is presently on trial."

alcohol and drug abuse for the purpose of showing an absence of mistake and telling the complete story "very-well may outweigh any prejudicial effect." The judge was cautious to condition his ruling, subject to a later proffer from the State, when he could assess the evidence in context.

¶47. During trial, Emily Anne gave a proffer outside the jury's presence. She testified about Bowman self-medicating with alcohol, marijuana, and prescription drugs and how it made him more angry and abusive towards her. According to Emily Anne, Bowman's substance use was daily. And his verbal and physical abuse increased, particularly in October 2014. Having heard the proffer, the trial judge stood by his ruling. He admitted testimony about Bowman's prior drug and alcohol use to show an absence of mistake and the *res gestae*—the complete story.

¶48. Evidence of prior substance abuse has been allowed by this Court to show an absence of mistake and to tell a complete story. In *Jones v. State*, the defendant was charged with her mother's murder. *Jones v. State*, 154 So. 3d 872, 876-77 (Miss. 2014). The defendant had a history of drug abuse and rehabilitation, during which she lost custody of her child and lost land—both to her mother. *Id.* at 875-76. The State argued this background was essential to tell the jury a logical, complete story of the tension between the defendant and her mother and to present a potential motive or absence of mistake, among other reasons, for the murder. *Id.* at 878-79. And this Court agreed. *Id.* at 880.

¶49. The situation is similar here. The judge allowed the alcohol and drug evidence to explain the couple's deteriorating relationship and resulting abuse and to tell the story leading

20

to Bowman's burglary and the attempted-murder charge. Otherwise, a jury could indeed be confused by a case involving a husband showing up to burglarize a remote hunting camp tethered to allegations that he was there to commit assault and eventually an attempted murder of his wife. We agree that this evidentiary call is a closer one than his earlier ruling admitting the prior-assault evidence.

¶50. But admission of other-acts evidence is largely left to the sound discretion of the trial judge. *Jones*, 904 So. 2d at 152. And the trial judge carefully crafted the conditions for this testimony and evidence to be admitted. He excluded evidence of drug distribution and limited the testimony to only the recent past. As the judge put it, the State could not present "five years worth of, you know, gosh every day or every Friday that he would get drunk and then he would threaten to beat her up that kind of thing." He recessed to study the law on this issue before conditionally finding the evidence was necessary for the State to tell the complete story. And he did not admit the evidence until after hearing a proffer from Emily Anne. But even assuming the alcohol and drug evidence was wrongly admitted, it did not affect Bowman's substantial rights. Many of Bowman's own admissions supported the burglary charge. And the not-guilty verdicts on two of the three charged crimes tend to show the jury did not lash out at Bowman out of mere prejudice after learning of his alcohol and substance abuse. Thus, we suggest the admission was at worst harmless.

### ii. Limiting Instruction

¶51. Again, Bowman pushes a limiting-instruction argument. But unlike the cautionary instruction about the assault that he did request and receive, he did not request a limiting

21

instruction relating to the alcohol and drug evidence. The burden of requesting a cautionary instruction falls on the defense, not the court. In 2004, "we abandon[ed] [the] requirement that a judge issue a sua sponte limiting instruction . . . ." **Brown v. State**, 890 So. 2d 901, 913 (Miss. 2004).

¶52. We opted instead to "return to the clear language of Rule 105"—a rule that "clearly places the burden of requesting a Rule 404(b) limiting instruction upon counsel." **Id.** This method is not only dictated by rule, but the Court has also recognized that limiting instructions "can actually focus the jury's attention on sensitive information . . . ." **Sipp v. State**, 936 So. 2d 326, 331 (Miss. 2006) (citing **Brown**, 890 So. 2d at 913). So defendants and attorneys often forgo seeking such instructions for tactical reasons. But, strategy aside, the fact remains Bowman never requested a limiting instruction about his prior alcohol and drug use. Thus, the judge was not bound to give one.

## V. Sentencing

¶53. Finally, Bowman argues that the judge's crime-of-violence designation should have been sent to the jury and found beyond a reasonable doubt. And he claims the judge's material misunderstanding of the law led to an increased sentence.

¶54. Sentencing falls within the trial court's discretion. And, generally, sentences within statutory limits are not subject to appellate review. **Thomas v. State**, 247 So. 3d 1252, 1257 (Miss. 2018). But when questions of law are raised, this Court's review is de novo. **Jones v. State**, 122 So. 3d 698, 700 (Miss. 2013).

### A. Mississippi Code Section 97-3-2

¶55.    Bowman points to the Court of Appeals's opinion in *Fogleman v. State*, No. 2016-KA-01244-COA, 2018 WL 4444057 (Miss. Ct. App. Sept. 18, 2018), *rev'd*, No. 2016-KA-01244, 2019 WL 4071866 (Miss. Aug. 29, 2019).  He argues that under the Court of Appeals' opinion, the trial court erred by finding his burglary was a crime of violence. Bowman asserts, as the Court of Appeals did, the crime-of-violence issue needed to be submitted to the jury and found beyond a reasonable doubt.  But, on certiorari review, this Court recently issued an opinion in *Fogleman* laying out how this is incorrect in two ways. *Fogleman v. State*, No. 2016-CT-01244-SCT, 2019 WL 4071866 (Miss. Aug. 29, 2019). First, burglary is an enumerated crime of violence and the crime-of-violence designation applies *automatically*, without any input or findings by the trial court.  *See* Miss. Code Ann. § 97-3-2(1)(o) (Rev. 2014).  Second, as is discussed in this Court's *Fogleman* opinion, Section 97-3-2 is not a substantive criminal statute.  *Fogleman*, 2019 WL 4071866, at *4. That section does not impose any *sentence* on a criminal defendant that would require a jury's determination of guilt as the United States Supreme Court mandated in *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).  *Id.*  Rather, Section 97-3-2 is an *enhancement* that, along with Mississippi Code Section 47-7-3(1)(g)(i) (Rev. 2014) in specific instances, deals *solely* with parole eligibility and early release.  *Id.* at *5. This does not violate Bowman's constitutional rights to due process, trial by an impartial jury, or a jury finding guilt on all elements of the offense beyond a reasonable doubt.  *See Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Moreover, Bowman has no recognized constitutional right to parole.  *See Vice v. State*, 679

23

So. 2d 205, 208 (Miss. 1996).  We see no error here.

### B.        "50% Crime"

¶56.    Bowman next argues the trial judge mistakenly applied Section 97-3-2(2), which deals with non-enumerated crimes of violence and parole eligibility.  He claims he has to serve more time in prison than he otherwise would have, because the judge thought Bowman would be eligible for parole after serving 50 percent or five years.[13]  Indeed, this belief was prominent when the judge crafted Bowman's sentence.  There is merit to Bowman's argument.

¶57.    As this Court recognized in *Fogleman*, there is some confusion over the interplay between Sections 97-3-2(1) and (2) and 47-7-3(1)(g)(i).  Section 97-3-2(1) lists enumerated crimes of violence, and burglary of a dwelling house is one of those listed crimes.  The crime-of-violence designation under Section 97-3-2(1) applies automatically, without any required findings by the judge.  By comparison, Section 97-3-2(2) provides a discretionary, case-by-case crime-of-violence designation in which the judge must make findings that the defendant "used physical force, or made a credible attempt or threat of physical force against another person as part of the criminal act."  Miss. Code Ann. § 97-3-2(2) (Rev. 2014).  And Section 97-3-2(2) concludes by stating, "[n]o person convicted of a crime of violence listed in this section is eligible for parole or for early release . . . until the person has served at least fifty percent (50%) of the sentence imposed by the court."  *Id.*  At the same time Section 97-

---

[13] As Bowman points out, the trial judge did state during sentencing that "[w]hen you complete what part of the sentence you've got to serve, and my understanding under the law right now, this is a 50 percent crime; which means the law requires that you serve half of that sentence."

24

3-2 was adopted, the Legislature amended Section 47-7-3, which deals with parole eligibility, to provide that "[n]o person who . . . is convicted of a crime of violence pursuant to Section 97-3-2 . . . shall be eligible for parole." Miss. Code Ann. § 47-7-3(1)(g)(i) (Rev. 2014). So there is an apparent statutory conflict concerning crimes of violence and parole eligibility.

¶58. The Court of Appeals resolved this conflict by assuming Section 47-7-3(1)(g)(i) trumped, so that no one convicted of a crime of violence—whether enumerated under Section 97-3-2(1) or designated under Section 97-3-2(2)—is eligible for parole. *Fogleman*, 2018 WL 4444057, at *3. But this Court has rejected this interpretation. Instead, this Court followed the directive that "[s]tatutes on the same subject, although in apparent conflict, should if possible be construed in harmony with each other to give effect to each." *Roberts v. Miss. Republican Party State Exec. Comm.*, 465 So. 2d 1050, 1052 (Miss. 1985). To that end, this Court provided the following approach:

> Section 43-7-3(1)(g)(i) *does* apply to the per se crimes of violence listed in subsection (1) of Section 97-3-2 because Section 97-3-2(1) is silent about parole eligibility. But Section 43-7-3(1)(g)(i) *does not* apply to the trial court's discretionary designation of a "crime of violence" under subsection (2) of Section 97-3-2. Rather, subsection (2)'s specific parole-and-early-release-eligibility provision controls.

*Fogleman*, 2019 WL 4071866, at *5.

¶59. Here, rather than find Bowman was wholly ineligible for parole like the Court of Appeals did in *Fogleman*, the judge was under the opposite impression that Section 97-3-2(2)'s 50 percent parole eligibility applied to all of Section 97-3-2—including the crimes enumerated in Section 97-3-2(1). And the judge fashioned Bowman's sentence based on this belief. While this interpretation of Section 97-3-2 is understandable, under this Court's

decision in *Fogleman*, it is also erroneous. Because burglary of a dwelling house is an enumerated crime of violence under Section 97-3-2(1), Bowman cannot serve half of his ten-year sentence before being eligible for parole as the judge believed. Instead, Bowman will have to serve the entirety of his ten-year sentence. *See Fogleman*, 2019 WL 4071866, at *5.

¶60. Much like the Court of Appeals, the judge here did not have the benefit of this Court's decision in *Fogleman*. In light of the confusion surrounding crimes of violence and parole eligibility, we reverse Bowman's sentence and remand his conviction to the trial court for resentencing. This allows the judge to fashion what he believes to be an appropriate sentence, consistent with this Court's opinion in *Fogleman*.

**Conclusion**

¶61. Bowman was tried for aggravated assault, attempted murder, and burglary. While the jury found that Bowman did not commit an aggravated assault or an attempted murder, it did find Bowman guilty of burglary. We find Bowman's burglary conviction is supported by sufficient evidence. The hunting camp was Emily Anne's dwelling house on October 18, 2014. Any claimed errors are either of Bowman's own making or simply are not an abuse of discretion or reversible error—with one exception, his sentence. Thus, while we affirm Bowman's conviction, we reverse and remand for resentencing in light of this Court's *Fogleman* decision.

¶62. **AFFIRMED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.**