# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CT-02202-SCT

*FLOYD ROBINSON*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/01/2007 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: LESLIE S. LEE |
| | JUSTIN TAYLOR COOK |
| | GLENN S. SWARTZFAGER |
| | LATISHA NICOLE CLINKSCALES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 05/13/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Floyd Robinson was indicted for the murder of his on-again, off-again girlfriend, Bridget Moore. Following a jury trial in the Circuit Court of Oktibbeha County, Mississippi, Robinson was found guilty as charged and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections ("MDOC"). Following denial of his "Motion for Judgment Notwithstanding the Verdict," Robinson filed notice of appeal. The Mississippi

Court of Appeals, in a five-four split, affirmed.[1] *See Robinson v. State*, 2009 WL 1524913, at *1 (Miss. Ct. App. June 2, 2009). This Court granted Robinson's "Petition for Writ of Certiorari."

**FACTS**

¶2.     On the afternoon of November 30, 2005, Moore's body was discovered inside her home. Moore had a gunshot wound, a bruise on her head, a bruise and minor scratches on her right arm, scrape marks on the backs of her calves, and a scratch and dried grass on her right knee. Officers from the Starkville Police Department found, *inter alia*, an unused .25 caliber shell casing in Moore's front yard. On the right side of Moore's front steps, the officers found two of Moore's broken fingernails.

¶3.     That same evening, Robinson was arrested at his home in Columbus, Mississippi, and taken to the interview room at the Columbus Police Department. A subsequent four-and-one-half-hour interrogation spanned into the early morning hours of December 1, 2005, and parts were videorecorded. The interrogation included prior domestic-violence allegations against Robinson by Moore and another former girlfriend, Marilyn McKinney. For example:[2]

> **Detective 1**: . . . Let me read this one to you . . . .
>
> I, Officer Williams, took a report from [McKinney] . . . . It said . . . her boyfriend, [Robinson], . . . *constantly keeps threatening her about killing her. He's always . . . taking her in the middle of nowhere putting a gun to her head and throat and telling her what he would do to her*. On the last evening 5-24-

---

[1]Judge Maxwell, not participating.

[2]A more complete version of the following discussion can be found in the dissenting opinion in *Robinson*. *See Robinson*, 2009 WL 1524913, at *7-8 (King, C.J., dissenting).

2

03 at approximately 16:30 to 17:00 hours, he took her to his house and started washing dishes. And *when she told him that she was going home, he went ballistic, and started to push, kick and pull out her hair. He pulled a gun on her then, and once he settled down he just told her to leave.*

. . .

**Detective 1**: Okay, *you've got two women saying they felt like you were going to kill them at one point or time.* Two separate women.

. . .

**Detective 1**: . . . I got *two different women* saying . . . you are doing these things to them. What do you say to them? . . . First – *tell us what happened with [McKinney]? She said you were washing dishes. She said she was going home and you go ballistic. You take her to the middle of nowhere, you pull a gun on her, threaten her.*

(Emphasis added.)

¶4.    During the interrogation, Robinson signed a statement, which he subsequently supplemented. On December 2, 2005, Robinson signed a second statement. These statements provided that, after an argument at Moore's home, Moore had pulled a gun on Robinson and, in the ensuing struggle, they had fallen to the ground, the gun had discharged, and the bullet had struck Moore.

¶5.    On January 18, 2006, Robinson was indicted for "unlawfully, wilfully, and feloniously, with deliberate design to effect death, kill[ing] and murder[ing] . . . [Moore], without authority of law and not in necessary self defense, in violation of [Mississippi Code] § 97-3-19 . . . ." Trial commenced on January 29, 2007.

¶6.    During the State's case-in-chief, a DVD recording of Robinson's November 30, 2005, interrogation was tendered as an exhibit.[3]  Counsel for Robinson objected and moved to suppress the DVD recording.  According to counsel for Robinson, outside the jury's presence, "[t]here is inadmissible information concerning a possible criminal background of [Robinson].[4]  I don't know if we can redact those portions."  The circuit court overruled Robinson's objection and motion to suppress, stating that "[t]he completeness of the issue that I have, that's what they're doing is interrogating a homicide.  That is different than eliciting evidence of a prior crime or criminal act."  The DVD recording was received into evidence and played before the jury in its entirety.

¶7.    After the State rested and Robinson's motion for directed verdict was overruled, Robinson took the witness stand.  On direct examination, Robinson acknowledged that he had a prior physical confrontation with Moore in 2004 when "she stuck her fingernail in my eye . . . ."  Despite that altercation, Robinson continued to live with Moore until July 2005, when she "called the police on me to come and get my clothes out of her house."  During this incident, Robinson admitted to pushing Moore.  Thereafter, Robinson moved back to his home in Columbus, although he continued to stay at Moore's home "[t]wo or three times out of a week . . . ."  On the evening of November 29, 2005, Robinson testified that the same McKinney brought food to his home and stayed for a few minutes when "[t]he phone rang,

---

[3]While the interrogation lasted four-and-one-half hours, the DVD recording included only three of those hours.  However, the prior domestic-violence allegations, *see* ¶ 3 *supra*, were included on the DVD recording.

[4]Specifically, "[t]here is evidence of a criminal proceeding involving another young lady, which had nothing to do with [Moore]."

and it was [Moore] calling." Robinson went over to Moore's home. According to Robinson, while in bed, watching television with Moore:

> I said [referring to a television character] that's an ugly lady there, and she said probably like your [bitch] look like . . . . And I said, oh Lord, here we go. I said, well, we ain't fixing to start all this. She said no, that's where you were. That's why you really didn't want to come over here because you just want to be with her. In my mind I said, yeah, I did, but . . . we just kept on talking. I said, well, I don't know.

After an argument ensued, Robinson claimed that he got up to leave, and Moore struck him in the back. As Robinson proceeded to leave, he realized he had forgotten his keys, and as he turned around, he saw "she had the gun." According to Robinson:

> she got up close to me. That's when I grabbed her hand, and we started wrestling with the gun. And we fell outside the house[,] . . . and that's when the gun went off. . . . I thought I was shot, and she said she thought she was shot. . . . I walked her back up to the steps. And she told me, . . . she was kind of tired. . . . I said, I'm fixing to go. I seen the gun. I grabbed the gun. I said I'm fixing to go. You know, the police come around here. I'm already on probation.[5] . . . And I said I'll call you back.[6]

In claiming that Moore's death was the result of an accident arising out of his act of self-defense, Robinson maintained that he loved Moore and had no reason to harm her.

---

[5]Regarding his probation, Robinson testified that it arose from the domestic-violence incidents involving Moore and McKinney, to which he had pleaded guilty. In explaining those guilty pleas, however, Robinson stated that the "only reason I pled guilty [was] because I had just started working at Weyerhauser. And I said, well, . . . since I can't take off work to be coming back to court, . . . I'll go ahead and plead guilty and pay the fine and be through with it."

As to why his probation compelled him to leave Moore's home, Robinson explained on cross-examination that his probation prohibited him from seeing Moore, even though they were still in a relationship.

[6]Robinson stated that Moore was not bleeding when he left her home. He could not explain how Moore got back into her home following the shooting.

¶8.     On cross-examination, the prosecutor was warned by the circuit court for the following argumentative questions, "[g]ot any scratches on you face, nose bleeding? *Did you look like Marilyn McKinney*?" (Emphasis added.)

¶9.     The jury found Robinson guilty of murder, and he was sentenced to life imprisonment by the circuit court. Following denial of his "Motion for Judgment Notwithstanding the Verdict," Robinson filed notice of appeal.

## COURT OF APPEALS PROCEEDINGS

¶10.    The Court of Appeals affirmed Robinson's conviction. *See Robinson*, 2009 WL 1524913, at *6. Regarding "Issue II. Prior Bad-Acts Evidence," the Court of Appeals found that:

> the challenged portion of the DVD at issue was that Robinson had previously been violent with [McKinney], rather than [Moore]. *That evidence does not tend to demonstrate a continuing or escalating pattern of violence against [Moore]. Instead, it tends to persuade the jury that, because Robinson was violent with [McKinney] on May 24, 2003, he was more likely to have been violent with [Moore] on November 30, 2005, and – by extension – he was more likely to have been guilty of the allegations against him*. Accordingly, we find that *the circuit court erred when it allowed the prosecution to submit that evidence to the jury*.

*Id*. at *3 (emphasis added). However, based upon Robinson's testimony, the Court of Appeals held that this error was harmless. Specifically:

> Robinson said he . . . told [Moore] that he was going to leave because he was on probation. Robinson's own attorney then asked Robinson to elaborate on his prior convictions that led to his being on probation. Robinson responded and testified that he had prior domestic violence convictions for abusing [Moore] *and* [McKinney]. *Because Robinson testified as to his prior conviction for domestic violence against [McKinney], and used that prior conviction as his justification for leaving [Moore's] house after [she] was*

6

*shot,[7] we find that Robinson did not experience any prejudice* based on the revelation during the interrogation that he had a prior conviction for domestic assault against [McKinney].

*Id*. at *4 (emphasis added).

¶11.    The Court of Appeals' dissent countered:

[i]t is Robinson's efforts at blunting the prejudicial effect of the improper prior-bad-acts testimony that the majority now claims turns the admission of that improper evidence into harmless error. Such a claim can only be the result of syllogistically faulty circular reasoning.

The prosecution's prior-bad-acts evidence was admitted prior to any testimony from Robinson. The damage from this improper prior-bad-acts evidence was completed prior to any testimony from Robinson. The testimony by Robinson as to prior bad acts was presented in an effort to place into perspective the improper prior-bad-acts evidence that was previously introduced by the prosecution. Because the damage was done before Robinson's attempt at mitigation, I would reverse and remand for a new trial.

. . .

The fallacy in the majority's attempt at blaming Robinson is simple and straight forward. Robinson did not present any defense until after the State had rested its case in chief. The improper prior-bad-acts evidence was introduced by the State in its case-in-chief. The State's sole purpose in introducing this improper prior-bad-acts evidence was to prove that Robinson killed [Moore]. *Before Robinson uttered the first word in his defense, the State had introduced the improper prior-bad-acts evidence, and the damage had been done*. Contrary to the opinion of the majority, once the damage has been done, it cannot be undone. *It especially cannot be undone by attempting to blame Robinson for the improper actions of the prosecutor*.

*Id*. at *11 (King, C.J., dissenting) (emphasis added).

---

[7]The Court of Appeals later stated that "Robinson interjected on his status as a prior convicted domestic-violence offender on probation, which logically prohibited him from possessing a weapon or being present at [Moore's] home, as a strategic trial decision to attempt to explain his otherwise unexplainable flight." *Id*. at *4.

7

**ISSUE**

¶12. This Court will consider:

Whether the circuit court abused its discretion in admitting evidence of Robinson's prior bad acts.

**ANALYSIS**

¶13. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused. . . . The discretion of the trial court must be exercised within the boundaries of the Mississippi Rules of Evidence." *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990) (citations omitted).

¶14. Robinson argues that "it's impossible to un-ring a bell[,]" and "it was impossible for the jury to disregard the highly prejudicial prior-bad-acts evidence." According to Robinson, the Court of Appeals' "harmless error determination creates a 'pre-impeachment' exception to the [Rules'] prohibition on the admission of prior-bad-acts evidence[,]" such that defendants are left with two undesirable options:

either take the stand and attempt to explain away and/or mitigate the prejudice already caused by the evidence, or, sit on one's hands, ignore one's Constitutional right to testify, assure one's own conviction based on the prejudicial prior-acts-evidence, and hope that the [a]ppellate court rules in his or her favor.

¶15. Mississippi Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith . . . ."[8] Miss. R. Evid. 404(b). *See also **Eubanks v. State***, 419

---

[8]Rule 404(b) also lists several exceptions to this rule, providing that such evidence "may . . . be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Miss. R. Evid.

8

So. 2d 1330, 1331 (Miss. 1982) ("Mississippi follows the general rule that proof of a crime distinct from that alleged in the indictment should not be admitted in evidence against the accused."). "This rule exists to prevent the State from suggesting that, since a defendant has committed other crimes previously, the probability is greater that he is also guilty of the offense for which he is presently charged." *Jasper v. State*, 759 So. 2d 1136, 1141 (Miss. 1999). *See also* *Floyd v. State*, 166 Miss. 15, 148 So. 226, 230 (1933) ("[s]uch evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and, while the accused may be able to meet a specific charge, he cannot be prepared to defend against all other charges that may be brought against him.").

¶16. We agree with the Court of Appeals that the circuit court erred in admitting the disputed portions of the DVD recording. *See* *Robinson*, 2009 WL 1524913, at *3, *6 (King, C.J., dissenting). Robinson was indicted only for Moore's murder, arising out of the November 29, 2005, incident. Nonetheless, the circuit court admitted evidence that Robinson previously had "constantly ke[pt] threatening [McKinney] about killing her[,]" and that "[h]e's always . . . taking her in the middle of nowhere putting a gun to her head and throat and telling her what he would do to her." Moreover, regarding the specific incident of May 24, 2003, involving McKinney, the jury was presented with evidence that Robinson "went ballistic, and started to push, kick and pull out [McKinney's] hair. He pulled a gun on her . . . ." As stated by the Court of Appeals, "[t]hat evidence . . . tends to persuade the jury that, because Robinson was violent with [McKinney] . . . , he was more likely to have

_____

404(b). Regarding the disputed portions of the DVD recording, however, none of these exceptions applies.

9

been violent with [Moore] on November 30, 2005, and – by extension he was more likely to have been guilty of the allegations against him." *Id*. at *3. Given the facts of this case, the evidence clearly was inadmissible under Rule 404(b). Therefore, its admission was outside the boundaries of the circuit court's discretion. *See* Miss. R. Evid. 404(b); *Jasper*, 759 So. 2d at 1141; *Johnston*, 567 So. 2d at 238; *Floyd*, 148 So. at 230.

¶17. The question then becomes, is this error harmless? This Court rejects the Court of Appeals' reasoning that Robinson's subsequent testimony cured this error. As cogently explained by the Court of Appeals dissent, "[b]efore Robinson uttered the first word in his defense, the State had introduced the improper prior-bad-acts evidence, and the damage had been done." *Robinson*, 2009 WL 1524913, at *11 (King, C.J., dissenting). Not only had the damage been done with respect to the jury being presented with inadmissible, prejudicial evidence, but also, Robinson's constitutional right to testify (or refrain therefrom) had been compromised. *See* U.S. Const. amend. V ("[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . ."). Based upon the admission of this evidence, Robinson was presented with the options of either taking the witness stand in an attempt to mitigate the prejudice caused, or foregoing that right and permitting the jury's consideration of such evidence without response. Subsequent testimony does not cure this error.

¶18. In sum, the disputed portions of the DVD recording were inadmissible under Rule 404(b). *See* Miss. R. Evid. 404(b); *Jasper*, 759 So. 2d at 1141; *Floyd*, 148 So. at 230. The circuit court's error in admitting such prejudicial evidence was not rendered harmless by Robinson's subsequent testimony. Therefore, the circuit court's admission of such evidence

10

constituted an abuse of discretion, requiring that this Court reverse and remand for a new trial.

## CONCLUSION

¶19.    We reverse the circuit court and the Court of Appeals and remand for a new trial.

¶20.    **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**