# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01041-COA

**GINO WASHINGTON, JR. A/K/A GINO WASHINGTON**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/19/2021 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/07/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Gino Washington Jr. was indicted by a Hinds County grand jury for capital murder in violation of Mississippi Code Annotated section 97-3-19 (Supp. 2017) and armed robbery in violation of Mississippi Code Annotated section 97-3-79 (Rev. 2014).  Following a jury trial, Washington was convicted on both counts and sentenced to life imprisonment for capital murder and thirty years for armed robbery to run consecutively.  Washington filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial,

which the trial court denied.  Washington appeals and asserts that (1) the trial court erred by improperly commenting on the evidence; (2) Washington's due process rights were violated when the State failed to preserve evidence; (3) the trial court erred by admitting evidence of Washington's prior convictions and other bad acts; and (4) the trial court erred by admitting irrelevant evidence.  After a review of the record, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

### A.    The Crime

¶2.    On July 8, 2018, Aaron Hancock and his girlfriend Kayla Gilmore picked up Washington in an attempt to purchase ten dollars' worth of marijuana from Washington. According to testimony given by Gilmore, the night ended when "Little G," the nickname Gilmore knew Washington by, robbed the couple at gunpoint and shot and killed Hancock.

¶3.    Gilmore testified that she and Hancock met Washington approximately four months prior at a laundromat in Pearl.  She said that Washington approached them and attempted to sell them marijuana.  Gilmore recalled that it was daytime during that initial meeting and testified that she had a clear view of Washington at that time as they chatted.  Although the couple did not buy any drugs from Washington that day, Gilmore testified that Hancock retained Washington's phone number and bought marijuana from him at a later date.

¶4.    Around 9:00 pm on the evening of July 8, 2018, Hancock wanted to buy marijuana from Washington again.  Gilmore testified that Hancock called Washington, and after agreeing to purchase ten dollars' worth of marijuana over the phone, Washington directed the couple to pick him up in Jackson on Bailey Avenue.

2

¶5.    After pulling alongside Washington as he walked down the road, Washington first came up to the passenger-side window of the car and "stared in the window for a few seconds or so" before he realized Gilmore was sitting in the front seat. After realizing the front seat was taken, Washington got into the back seat of the car.

¶6.    Washington directed the couple to a home approximately five to ten minutes away. They parked and Washington went into the house to retrieve the marijuana. Gilmore said that as they waited, they began to get nervous, and she and Aaron each took half of a pair of broken scissors, which they hid on their persons "in case anything happened." Washington came back to the car after approximately fifteen minutes inside the house, and showed the couple a bag of marijuana. After re-entering the back seat of the couple's car, Washington directed them to "drop him off where we picked him up." As they approached the area where they picked up Washington, he instructed them to pull into the driveway of an abandoned house nearby.

¶7.    After parking in the driveway, Washington, who was still seated in the back seat, pulled out a gun and pointed it at Hancock and then Gilmore. He ordered them out of the car. As they exited the car Gilmore stopped walking and, facing Washington, pleaded with him in disbelief, telling him repeatedly "you're not doing this." Washington threatened to shoot Hancock if she did not comply, so Gilmore sat down where Washington directed her to sit. After she sat, Washington demanded the couple's keys, phone, and money. Neither Hancock nor Gilmore had any money on their person (as they had left their wallets in the car), so Hancock threw the phone the couple shared and the keys to their shared car onto the ground.

3

¶8. After this, Gilmore moved from a seated position to her hands and knees, "pretending as if I was hyperventilating" and requesting her inhaler. According to Gilmore, as Hancock attempted to console her, Washington started shooting at them. She testified that she "felt the heat and wind of the bullets" as she tried to get away. After the incident she realized she had a bullet hole straight through her baggy shirt, an indication of how close she came to death or serious injury that night.

¶9. As the shooting stopped, Gilmore testified that she heard Hancock scream. She looked toward Hancock and saw him fall to his knees. She testified that she saw Washington grab the keys and cell phone that Hancock threw on the ground. She said she saw Washington get in the couple's car and shut the door. Gilmore said that she then grabbed the half-pair of scissors that was in the waistline of her pants and tried to stab Washington through the car window that was cracked open. She testified that Washington reversed the car so quickly that he hit the abandoned house behind him, dragging her along with the car because her arm was stuck in the window. Indeed, photographs from when the stolen car was found showed red paint from the abandoned house on the rear bumper, corroborating Gilmore's story. Gilmore testified that she freed her arm and chased Washington down Bailey Avenue as he drove away, while she called for help. Gilmore found a pedestrian and borrowed his phone to call 911. She testified that she then returned to Hancock in time to see him take his last breath.

## B. The Investigation

¶10. Corporal Corry Jenkins interviewed Gilmore at the scene. While on scene Corporal

Jenkins learned that the suspect went by the name of "Little G." He also took a general description of the suspect from Gilmore and learned that a vehicle, a cell phone, and money inside the vehicle were stolen. Jenkins testified that he later learned from a fellow detective that "Little G" was a nickname for Gino Washington. After learning this information Jenkins prepared "a six-man non-suggestive photo lineup."[1] He showed the lineup to Gilmore on July 13, 2018, five days after the murder and armed robbery. Both Gilmore and Jenkins testified that Gilmore circled Washington's photograph and crossed out the others, indicating he was her assailant. She also wrote on the original, "this man killed Aaron Hancock, tried to kill me, and stole Aaron's car." Gilmore signed and dated her statement.

¶11. Washington was arrested on July 17, 2018, nine days after the murder and robbery. At the time of his arrest, Washington had a 9-millimeter gun in his possession. After his arrest, Washington was interviewed by Corporal Jenkins and two FBI agents. During Washington's recorded interview, Washington denied having the nickname "Little G" and denied knowing about the murder.

¶12. During Gilmore's July 13, 2018 interview, Gilmore gave Corporal Jenkins the serial number to the cell phone that was stolen. On July 18, 2018, using the serial number provided by Gilmore, Corporal Jenkins used a program available to law enforcement agencies to trace serial numbers from stolen items to locate the stolen cell phone. Corporal Jenkins testified that using this program, he found that the stolen cell phone was sold to an Eco ATM by

---

[1] Corporal Jenkins described a six-man non-suggestive photo lineup as one in which the suspects in the lineup have "the same complexion, same hair cut, [and] same facial . . . similarities."

Washington at 1:25 p.m. on July 9, 2018, approximately fifteen hours after the robbery and murder occurred. An Eco ATM representative explained that an Eco ATM is a kiosk where consumers can bring unwanted electronic devices in exchange for payment. Each Eco ATM transaction requires a valid government-issued ID, scanned by the machine. It imports the information from the ID and takes multiple photographs of the seller. This information is added to the description and photographs of the product sold to create a report. The Eco ATM report for this transaction contained photographs of Washington from the kiosk, a copy of his ID information, and photographs and data from the stolen cell phone.

### C. The Trial

¶13. Washington's trial was held from July 7-9, 2021. Testimony from investigators at the scene determined that fingerprints and DNA recovered from the stolen car were insufficient to test against Washington's fingerprints and DNA. One investigator established that a spent .40-caliber shell casing was found at the scene. According to the crime scene photos, this casing was found in the yard on the other side of a gravel driveway, not near the abandoned house where Hancock's body lay. No additional projectiles or casings were found at the scene or were recovered from Hancock's body. But half of a pair of broken scissors was recovered by investigators at the scene.

¶14. Outside of the jury's presence, a major discussion took place over the contents of the recorded interview between Washington, Corporal Jenkins, and the FBI agents. The State wanted to play the interview for the jury, and the defense requested that some portions of the interview be redacted. The State and defense agreed that references to Washington's prior

6

crimes should be redacted. The trial court determined, over the State's objections, that mentions of Washington's drug use should be redacted as well. The trial court allowed references to the gun Washington was arrested with, over the defense's objection, because it was relevant to Washington's armed robbery charge. The next day, as the recorded interview was admitted into evidence, the defense read into the record all the specific times in the interview that the court ruled would be redacted. The defense reiterated its objection to the discussion of the gun in the recorded interview before the interview was played for the jury. No additional objections were made by the defense after Washington's recorded interview was played.

¶15. After Washington's recorded interview was played, the defense laid a foundation for the 9-millimeter gun found on Washington during his arrest and entered it into evidence. After entering the 9-millimeter gun into evidence, the defense questioned Corporal Jenkins about the .40-caliber shell casing found at the crime scene. When asked if a .40-caliber bullet could be shot from a 9-millimeter handgun, Corporal Jenkins testified that "there's no way that that's possible" because the bullet would not fit into the gun. All investigators who testified about the casing stated that the .40-caliber casing could not have been shot from the 9-millimeter gun that was found on Washington during his arrest.

¶16. A copy of the six-man non-suggestive photo lineup Gilmore viewed during her police interview was entered into evidence during Corporal Jenkins' testimony. Washington's attorney objected and argued that the copy of the lineup was not the same as the original and should not be entered into evidence because "it's not the one that [Jenkins] showed

7

[Gilmore]." The defense maintained that the original was a color lineup, while the black-and-white copy was "essentially, black boxes." The State disagreed, acknowledging that the copy was not as clear as the original but that the faces in the copy were clearly discernable. The State noted that the original lineup was lost but that copies were admissible if the proper foundation was laid.

¶17. After hearing the objection, the trial court allowed the black-and-white copy of the lineup to be admitted because the court had no "doubt that what is being presented, although in copy form" was the photographic lineup "that also had wording there" from Gilmore to indicate who she believed committed the crimes. Both Jenkins and Gilmore testified that the lineup was the same as the one presented to Gilmore during her interview. Corporal Jenkins also confirmed during his testimony that the State could not locate the video that showed Gilmore selecting Washington from the lineup.

¶18. Gilmore provided powerful testimony about her experience that night. She also testified that she selected Washington from the lineup during her police interview without hesitation because she recognized him. Gilmore testified that on that night "we recognized him as he was walking – when we first picked him up." She stated that she saw Washington clearly that night as he looked in the passenger-side window of the car when Hancock stopped to give him a ride, then when she turned to speak to him when they chatted in the car, and when she was standing in front of him at gunpoint at the abandoned house. Not only did Gilmore state that she recognized Washington from the copy of the lineup placed in evidence, she also pointed to him in court and stated "I'm 100 percent sure, that that man

8

over there, is the one" who killed Hancock, shot at her, and stole the couple's car.

¶19.   At the beginning of the third day of trial, the State requested that the trial court admonish the jury to let them know that the case was not a death penalty case. During Washington's recorded interview played for the jury on the previous day, one of the FBI investigators was shown telling Washington that the penalty for capital murder was the death penalty or life in prison. The defense objected to the requested admonishment, stating that the State did not request that portion of the interview to be redacted and that drawing attention to the recorded comment now would be improper. The trial court disagreed, ruling that it was important for the jury to understand that the case was not a death penalty case. When the jury came in that morning, the court clarified to the jury that the case was not a death penalty case.

¶20.   At the close of the State's witnesses' testimonies, the defense made a motion for a directed verdict, which was denied. The defense offered no witness testimony. After deliberations, the jury found Washington guilty of capital murder and armed robbery. Washington was sentenced to life in prison for capital murder and thirty years for armed robbery, to be served consecutively. On July 20, 2021, Washington filed a motion for JNOV or, in the alternative, a new trial, which was denied. On September 2, 2021, Washington filed his notice of appeal.

## STANDARD OF REVIEW

¶21.   We review a circuit judge's decision to admit or exclude evidence under an abuse-of-discretion standard. *Graves v. State*, 492 So. 2d 562, 565 (Miss. 1986). "Such error will

9

warrant reversal only when the abuse of discretion has resulted in prejudice to the accused."

*Moss v. State*, 977 So. 2d 1201, 1207 (¶4) (Miss. Ct. App. 2007). However, "we employ 'a de novo standard of review when presented with constitutional issues.'" *Tillis v. State*, 176 So. 3d 37, 45 (¶15) (Miss. Ct. App. 2014) (quoting *Smith v. State*, 25 So. 3d 264, 269 (¶11) (Miss. 2009)).

**DISCUSSION**

### I. Impermissible Comments by the Trial Court

¶22. Washington first alleges that the trial court committed reversible error when it admonished the jury in order to clarify that Washington's case was not a death penalty case. We disagree and find no error by the trial court.

¶23. Mississippi statutes clearly state that "[t]he judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence; but at the request of either party he shall instruct the jury upon the principles of law applicable to the case." Miss. Code Ann. § 99-17-35. And our Supreme Court has "made clear that [it] will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Jones v. State*, 669 So. 2d 1383, 1387 (Miss. 1995) (quoting *Layne v. State*, 542 So. 2d 237, 242 (Miss. 1989)). Although a trial court may not "sum up or comment on the testimony," we do allow judges to attempt to clarify counsel's questions or stop repetitive questioning. *Roberson v. State*, 287 So. 3d 219, 243 (¶84) (Miss. Ct. App. 2017). We also allow a judge to comment incident to ruling on an objection. *Washington v. State*, 957 So.

10

2d 426, 429 (¶14) (Miss. Ct. App. 2007). And we allow a trial court to make clarifications to the jury as long as the trial judge is not appearing to be prejudicial and is not commenting on the weight and credibility of testimony. *Williams v. State*, 761 So. 2d 149, 156-57 (¶24) (Miss. 2000); *Lawson v. State*, 292 So. 3d 266, 277-78 (¶37) (Miss. Ct. App. 2019).

¶24. In the present case, the trial court made the following admonishment to the jury:

> On yesterday, the interrogation video of the Defendant was played. Do you all remember that, which would have been when the police were talking with the Defendant and you saw that on one of . . . those television screens. During that interview, the FBI Agent, one of them, I'm not sure which one, made mention that the Defendant would be facing death if found guilty. Ladies and gentlemen, this is not a death penalty case. I do not want you all to think that the Defendant is looking at the death penalty. This is not a death penalty case. Often times, just as you heard on yesterday, Police Officers say certain things and they use tactics in order to elicit a confession or a particular response from a Defendant; and that's all that the Agent was doing, okay, just simply trying to scare Mr. Washington into either making a confession or giving a certain response. Okay. So do not think that the death penalty is on [the] table.

¶25. This statement by the trial court displays no prejudice to Washington, nor does it comment on the weight or credibility of a witness's testimony. Here the trial court is clarifying a fact for the jury—that Washington's case was not a death penalty case. This kind of factual clarification is not prohibited. *Williams*, 761 So. 2d at 156-57 (¶24); *Lawson*, 292 So. 3d at 277-78 (¶37). Because the trial court's statements are not the kind of comments that a trial court is prohibited from making before the jury, we find no error on this issue.

## II. Failure to Preserve Evidence

¶26. Washington next argues that his due-process rights were violated because the State lost the original six-man photo lineup and the video of Gilmore picking Washington's picture from the lineup. Washington states that this loss prevented him from impeaching Gilmore's

11

identification of him. He cites the Supreme Court's edict that the State has a constitutional duty to preserve evidence that might be expected to play a significant role in the suspect's defense, including impeachment evidence. *California v. Trombetta*, 467 U.S. 479, 488 (1984); *United States v. Bagley*, 473 U.S. 667, 676 (1985). But at trial Washington only objected to an inferior copy used in place of the original color version of the lineup. At trial, Washington did not object based on due process violations or indicate to the trial court that he objected because the lineup was suggestive. Therefore, the trial court did not have an opportunity to address these issues. This Court does "not consider issues raised for the first time on appeal." *Anderson v. LaVere*, 136 So. 3d 404, 410 (¶27) (Miss. 2014). Despite this procedural bar, we will briefly address this issue.

¶27. The Mississippi Supreme Court employs the following three-part test when a defendant claims that his or her due process rights were violated because the State lost or destroyed evidence:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Tillis*, 176 So. 3d at 52 (¶46) (quoting *Freeman v. State*, 121 So. 3d 888, 895 (¶16) (Miss. 2013)).

¶28. With regard to the first prong of the test, Washington argues that the loss of the original color lineup and video of Gilmore selecting a suspect from the lineup prevented him from possible impeachment of the primary witness in his case. Because no forensic evidence

tied Washington to the crime, he argues Gilmore's testimony and identification were crucial for his conviction. We agree that the evidence lost possessed a potentially exculpatory value for Washington, and it was apparent that it could be used for impeaching a key witness.

¶29. We find, however, that Washington's claim regarding the original color lineup fails on the second prong of the test. At the trial, Washington had available a black-and-white copy of the lineup. Although the original was lost, copies of a photo lineup are admissible at the trial court's discretion if the trial court determines the document is what it purports to be. *Anderson v. State*, 25 So. 3d 1074, 1080 (¶30) (Miss. Ct. App. 2009). Since the trial court found that the black-and-white copy with Gilmore's handwriting was an acceptable copy, Washington had "comparable evidence" of the photo lineup. The same cannot be said, however, of the video of Gilmore selecting Washington from the lineup.

¶30. Washington's claim regarding the video of Gilmore's lineup selection instead fails on the third prong of the test. This Court has recently held that "[b]ad faith, the third and final prong, is defined as not simply bad judgment or negligence, but rather conscious doing of a wrong because of dishonest purpose or moral obliquity." *Harris v. State*, 311 So. 3d 638, 661 (¶64) (Miss. Ct. App. 2020) (citing *Robinson v. State*, 247 So. 3d 1212, 1234 (¶57) (Miss. 2018), *cert. denied*, 310 So. 3d 832 (Miss. 2020). "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Id*. (quoting *Young v. State*, 236 So. 3d 49, 56 (¶31) (Miss. 2017)).

¶31. In the present case, Washington argues in his brief that "the fact that both the lineup

13

and the video were lost points to intentional action by the State and, thus, bad faith." But Washington does not actually show a conscious doing of a wrong, or dishonesty on the part of the State. At trial, the only evidence related to Gilmore's lineup selection video is contained in the following exchange between Corporal Jenkins and Washington's attorney:

Q: Okay. On the 13th. The 13th is when she did this lineup, correct?

A: That's correct.

Q: Was that interview recorded?

A: That's correct.

Q: It was?

A: When she did the photo lineup?

Q: Yes.

A: Yes, it was recorded.

Q: Where is that video?

A: I can't advise where the video is.

Q: So, I guess -- let's, I guess, let's get it straight. Now, we've lost the copy -- well, we've lost the original lineup showing the color photo of the people in this lineup, we lost that. You said it's on the video. We don't have that either, right?

A: Correct.

¶32. Nothing in this exchange indicates bad faith on the part of the State. Corporal Jenkins merely acknowledged that the video was lost. This is a far cry from a "conscious doing of a wrong because of dishonest purpose or moral obliquity" that a defendant must prove to show bad faith. *Harris*, 311 So. 3d at 661 (¶64). Because Washington has failed to prove

14

that the State acted in bad faith, we find that Washington's claim regarding the loss of the lineup video must fail as well.

### III.   Admission of Washington's Prior Convictions and Other Bad Acts

¶33.   Washington next alleges that the trial court erred by allowing evidence of his prior convictions and drug use to be played to the jury in the video of the interview between Washington, Corporal Jenkins, and the FBI agents.  But Washington also admits that it is unclear whether the jury actually heard the inadmissible parts of his interview.  After a review of the record, we find no reversible error on this issue.

¶34.   "Mississippi Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. . . ." *Robinson v. State*, 35 So. 3d 501, 506 (¶15) (Miss. 2010) (quoting MRE 404(b)).  "[S]uch evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and, while the accused may be able to meet a specific charge, he cannot be prepared to defend against all other charges that may be brought against him." *Id*. (quoting *Floyd v. State*, 166 Miss. 15, 148 So. 226, 230 (1933)).

¶35.   Here, Washington points out that the State agreed to certain redactions in the video, and that the trial court ruled that Washington's prior convictions and drug use should not be played for the jury.  He then argues that because the video of Washington's interview was not redacted, those portions *may* have been played for the jury, stating that "it is unclear." But a redaction is not the only way to prevent a jury from hearing portions of a recorded interview.  It is possible, for instance, that the video was skipped forward over the

15

inadmissible parts of the interview. Regardless, if Washington cannot say for certain whether or not the jury actually saw the inadmissible portions of the video, this Court refuses to speculate beyond what is in the record.

¶36.   The record shows that multiple lengthy discussions took place over what to redact from Washington's interview. References to prior drug use and prior convictions were ruled to be inadmissible by the trial court. The discussions of the gun found on Washington at his arrest were kept over the objection of the defense because the weapon was pertinent to the armed robbery charge. The transcript records "video playing" and "video stopped" without indicating any redactions. The transcript does not, however, reflect a contemporaneous objection by Washington following the jury's viewing of his interview that would indicate impermissible material was shown to the jury. Washington made no objection at all after his interview video was shown. Moreover, he made no move to strike the material that the trial court had deemed inadmissible.

¶37.   "Any claim is waived for failure to raise a contemporaneous objection." *Wells v. State*, 698 So. 2d 497, 514 (Miss. 1997) (citing *Ballenger v. State*, 667 So. 2d 1242, 1272 (Miss. 1995)). "An objection must be made with specificity, and failure to articulate the grounds for objection constitutes a waiver of the alleged error." *Ross v. State*, 954 So. 2d 968, 987 (¶27) (Miss. 2007). "An objection cannot be enlarged in the reviewing court to embrace an omission not complained of at trial." *Smith v. State*, 986 So. 2d 290, 295 (¶13) (Miss. 2008). "This Court cannot find that a trial judge committed reversible error on a matter not brought before him or her to consider." *Id*. (citing *Montgomery v. State*, 891 So. 2d 179, 187 (¶33)

16

(Miss. 2004)).

¶38. In the present case, it is clear that Washington originally objected to mentions of the prior bad acts and drug use in his videoed interview, objections which the trial court sustained with the State's agreement. It is not clear whether those inadmissible portions of the video were actually played. We presume the trial court's order was followed since we know that Washington did not object after the jury's viewing of the video. To stretch Washington's original objection to the prior bad acts at the trial level to cover the *possibility* that the trial court showed inadmissible evidence is to enlarge the original objection "to embrace an omission not complained of at trial." *Id*. This kind of enlargement is expressly prohibited. *Id*. Because there is no indication that the inadmissible portions were actually played for the jury, and because this issue is procedurally barred, we can find no error on this matter.

## IV. Admission of Irrelevant Evidence

¶39. In Washington's final assignment of error, he argues that the trial court allowed irrelevant evidence when it admitted the 9-millimeter gun into evidence even though there was no evidence tying that particular gun to the crimes. But because the defense itself is the party that moved the gun into evidence, this argument is without merit.

¶40. This Court has recently reiterated that "[u]nder the invited-error doctrine, 'a defendant cannot complain on appeal of alleged errors invited or induced by himself.'" *Jennings v. State*, 311 So. 3d 712, 718 (¶17) (Miss. Ct. App. 2021) (quoting *Thomas v. State*, 249 So. 3d 331, 347 (¶55) (Miss. 2018)). The doctrine's purpose is to (1) "bind trial counsel to strategic

17

decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client"; and (2) "defeat[] the disreputable strategy aimed at requesting a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment." *Thomas*, 249 So. 3d at 347 (¶56).

¶41. In the present case, the following exchange occurred between Washington's defense attorney and Corporal Jenkins:

Q: Okay. Let me hand you a box. You recognize that?

A: Yes.

Q: Okay. Now, I'll ask you if you would, kind of, turn it around and open it up for me. Open it up for me. What does that look like to be to you, officer?

A: A handgun.

Q: Okay. Does it appear to be a 9 millimeter?

A: That's correct.

Q: Do you know where the serial number would be located on that gun?

A: It's right there on the side.

Q: Okay. What is the serial number on that gun?

A: 103780.

Q: So that's the same number that you reference in your report as having been -- that's the firearm that Mr. Washington was arrested with?

A. That's correct.

Q. Does that gun look the same as it did back in 2018?

A: That's correct.

18

Q:     Has it been altered, changed, in any kind of way?

A:     No, it hasn't.

BY MR. ROUTH [DEFENSE ATTORNEY]:     Your Honor, at this time we move this weapon into evidence?

THE COURT:     Any objection?

BY MS. AGHO [STATE ATTORNEY]:     No objection

THE COURT:     Okay. Pass that box over to the Court Reporter for me. Is this D1?

THE COURT REPORTER:     D18. . .

THE COURT:     That's fine.

¶42.   This exchange shows that Washington was the party that entered the 9-millimeter gun into evidence. Under the invited error doctrine, Washington cannot enter the gun into evidence and then complain on appeal that the gun's admission was irrelevant. *Jennings*, 311 So. 3d at 718 (¶17). "To hold otherwise would allow the defendant to invite error and later take advantage of it on appeal." *Ross v. State*, 288 So. 3d 317, 324 (¶27) (Miss. 2020) (quoting *Ambrose v. State*, 254 So. 3d 77, 112 (¶102) (Miss. 2018)). Thus, we decline to find any error on this final issue.

### CONCLUSION

¶43.   In conclusion, after a review of the record, we find no abuse of discretion regarding the trial court's evidentiary decisions. Nor do we find error in Washington's additional arguments. Accordingly, the trial court's order denying Washington's motion for JNOV or, in the alternative, a new trial, is affirmed, as are the convictions and sentences.

19

¶44.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR.  WILSON, P.J., McCARTY AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**